# HOLLY SUGAR CORPORATION v. FRITZLER, ET AL.

### (Nos. 1633, 1634; Feb. 16, 1931; 296 Pac. 206)

448

For the appellant in Case Numbered 1633, there was a brief by *Reid & More,* of Torrington, Wyo., and oral arguments by *Mr. More* and *Mr. Reid,* of Torrington, and by *Mr. C. R. Ellery,* of Cheyenne, Wyoming.

452

For the respondents there was a brief by *David J. Howell, Walter Q. Phelan, Edward B. Almon,* and *Lee & Lee,* of Cheyenne, Wyoming, and *John L. Sawyer* and *Everett Taylor,* of Torrington, Wyoming, and oral argument by *Walter Q. Phelan* and *Ray E. Lee.*

454

For the appellants in case Numbered 1634, there was a brief by *David J. Howell, Walter Q. Phelan, Edward B. Almon* and *Lee & Lee,* of Cheyenne, Wyoming, *John L. Sawyer* and *Everett Taylor,* of Torrington, Wyoming, and oral argument by *Walter Q. Phelan* and *Ray E. Lee.*

456

For the respondents in Case Numbered 1634, there was a brief by *Reid & More,* of Torrington, Wyoming, and *C. R. Ellery,* of Cheyenne, Wyoming, and oral arguments by *Mr. More, Mr. Reid* and *Mr. Ellery.*

BLUME, Justice.

This is an action mentioned by counsel as one in equity and under the declaratory judgments act, brought in Goshen County, Wyoming, in which the plaintiff, the Holly Sugar Corporation, joined as defendants 381 persons who had grown beets and delivered them to plaintiff's factory at Torrington, Wyoming, during 1926. 212 defendants appeared and answered. 121 more were served, but made default. 48 other persons were not served, due to the fact, as claimed by plaintiff, that service of summons could not be had upon them in Goshen County, Wyoming. About fifty of the defendants gave testimony in the case. It was alleged in the petition that in the spring of 1926 the plaintiff entered into a written contract with each of the defendants for the growing of beets during that year and delivery thereof to plaintiff's factory which was then being constructed; that the contracts were all of like tenor and effect, differing only in the dates, names of the growers, and the de-

scription of the lands on which the beets were to be grown. A copy of the contract was attached to the petition, and provides, among other things, that the defendants should respectively grow beets as above mentioned and deliver them to the factory, and that plaintiff would pay therefor a price ranging from $6 to $14.92 per ton, depending on the average net price received for the sugar by the plaintiff and the average percent of sugar in the beets sliced, the sugar content to be determined by taking the average of the tests made of all beets sliced in the factory of plaintiff. The last section—the contracts being in printed form—was Section 17 A, but it was separate from the main body of the contract and by way of addendum, so that the contract required signatures at two different places. That is the only section which is in controversy in this case. It will be quoted verbatim hereafter, and was, briefly, to the effect that the plaintiff would pay as high a price for the beets as any competing company, provided that such price would not be ruinous, and that a net price received for 50% of the sugar in the bag produced from the beets should be considered ruinous; that in no event, however, would the plaintiff pay less than a minimum of $6 per ton. None of the other provisions of the contract are in controversy and need not, accordingly, be set out herein. Further allegations in the petition material here were, abbreviated, substantially to the following effect:

"Plaintiff paid each of the defendants the sum of $6 per ton, the minimum price fixed under the contract, that being the whole amount due them, but a large number of the defendants claim that there is due them the further sum of $2.00 per ton in accordance with the terms of Section 17 A of the contract. Many of the defendants have threatened to sue plaintiff and claim that plaintiff was negligent in and about the operation of its factory and in its supervision of the growth, harvesting and delivery of the beets. A number of defendants have already employed attorneys for the purpose of such suits. The basis of their claim is the fact that the Great Western Sugar Company, a competing com-

pany, paid, during 1926, the sum of $8 per ton for beets. That price, however, was a ruinous and competitive and unfair price and the plaintiff does not owe anything to the defendants under Section 17 A of the contract; on the contrary, there was due thereunder,—not considering the minimum price mentioned therein — only the sum of $5.35, which is the net price received by the plaintiff for 50% of the sugar in the bag as contemplated in Section 17 A. The demands already made on the plaintiff by a number of the defendants aggregate the sum of $87,039.00. The probable cost and expense to plaintiff in preparing and trying a separate suit for each of the defendants would be large. The defendants who have not already threatened suits are all interested in this action and would each be affected by a declaration of rights made by the court therein. If separate suits were brought each would involve an accounting in connection with 150,000 tons of beets and 300,000 bags of sugar. Plaintiff has no adequate or speedy remedy at law, and a temporary restraining order should be granted herein. A declaratory judgment of the court with respect to the questions in controversy will avoid a multiplicity of suits and will spare the plaintiff the vexation, delay and expense incident to the trial of a number of actions. Plaintiff accordingly prays a decree, first, that a price of $8 per ton of beets be declared to be a ruinous, competitive price and unfair competition, under the provisions of Section 17 A of the contract; second, that the proper and full price of beets due and owing the defendants under the contract be declared to be the sum of $6.00; third, that it be declared that the plaintiff has not been negligent in connection with the contract; fourth, that the matters decided be declared to be *res judicata* between the plaintiff and the several defendants. Further equitable relief is also prayed."

Defendants demurred to the petition, setting up defect of parties; that separate causes of action against the several defendants were improperly joined, and because the petition did not state facts sufficient to constitute a cause of action. The demurrer was overruled, whereupon answers were filed. These answers were stricken. Subsequently an amended answer was filed by all of the parties appearing in the case except one. In this amended answer it was alleged that the plaintiff prepared and drew the contracts; that the

contract in question was one which took the place of a previous one, the execution of the contract mentioned in the plaintiff's petition being admitted. In addition to pleading several matters contained in Section 17 A of the contract, the amended answer alleged that plaintiff's agents, for the purpose of inducing and procuring the defendants to execute the latter contract, made certain representations, promises and statements as to what the plaintiff would pay under the terms of the contract and what the meaning of the contracts actually was; that plaintiff, by bringing this action, was endeavoring and seeking to secure the aid of a court of equity in carrying out its fraudulent intent and purpose of deceiving the defendants and to deprive them of the right and opportunity to recover damages on account of these fraudulent acts and on account of breaches of its contract. These representations need not be set out herein, inasmuch as they are substantially of the character of those hereinafter more fully discussed. The plaintiff, in reply, filed a general denial, in so far as it contained any new matter. No jury was demanded and the case was tried to the court. A decree was entered herein substantially as prayed in the petition, except that the court refused to determine what, if any, effect the representations of the agents of plaintiff had upon the interpretation of the contract and whether or not any of the defendants had any cause of action against the plaintiff by reason of any false and fraudulent representations made by such agents. Both parties have appealed. We shall first consider the appeal taken by the defendants. Some additional facts will be mentioned as we proceed.

1. It is contended that the Uniform Declaratory Judgments Act, adopted by our Legislature in 1923, is unconstitutional, since a power is thereby conferred upon the courts which is non-judicial in character. The main provisions are as follows:

Section 1. "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for. The declaration may be either affirmative or negative in form and effect; and such declarations shall have the force and effect of a final judgment or decree."

Section 2. "Any person interested under * * * a written contract * * * may have determined any question of construction * * * arising under the * * * contract * * * and obtain a declaration of rights, status or other legal relations thereunder."

Section 3. "A contract may be construed either before or after there has been a breach thereof."

Section 9. "When a proceeding under this Act involves the determination of an issue of fact, such issue may be tried and determined in the same manner as issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending."

Section 11. "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding. * * *"

Section 12. "This Act is declared to be remedial, * * * and is to be liberally construed and administered."

Proceedings under a declaratory judgment act have almost uniformly been upheld by the courts. Morton v. Const. Co., (Ariz.) 283 Pac. 281; State ex rel. v. Grove, 109 Kans. 619, 201 Pac. 82, 84, 19 A. L. R. 1116; Blakeslee v. Wilson, 190 Cal. 479, 213 Pac. 495. Many other cases may be found in the Annotations on Declaratory Judgments in 12 A. L. R. 76, 19 A. L. R. 1130, 50 A. L. R. 42, 68 A. L. R. 110. In 28 Yale L. J. 1 is contained an article which has traced the history of these judgments, and from which it appears that, though only to a limited extent, they were or have been in use under the Roman, Italian, French and German laws, and continually in Scotland for several centuries, and that our laws are based on those which were first introduced in England in 1852. When mankind has,

accordingly, considered proceedings of that character as judicial for the period of 2000 years, it would ill behoove us to declare the contrary. The only case in point cited by counsel for the defendants is the case of Anway v. Grand Rapids R. Co., 211 Mich. 592, 12 A. L. R. 26, 179 N. W. 350. But that case was virtually overruled by the later case of Washington-Detroit Theater Co. v. Moore, 249 Mich. 673, 229 N. E. 618, 68 A. L. R. 105. In Braman v. Babcock, 98 Conn. 549, 120 Atl. 150, 152, the court said that "to hold that the judicial power of this state is confined to the consideration of cases where consequential relief only is sought would be enforcing a limitation upon the judicial power, in accord with custom rather than reason or logic." In fact, some of the relief granted under the declaratory judgments act does not materially differ from that which already previously was granted by the courts in ordinary cases. The court in State ex rel. v. Grove said:

"Actions to quiet title and to construe wills are recognized methods of invoking judicial action which do not originate in the actual commission of a wrong or terminate in a judgment inflicting a penalty, granting compensation or injunction, or otherwise giving 'consequential relief;' the declaration of rights being all that is necessary to fit the requirements of the case. The decree in an action to quiet title is sometimes so drawn as to order the setting aside or cancellation of a deed. A declaration that the instrument is void and without effect amounts to the same thing. The judgment does not change the condition of the title, but simply declares where it is vested. It gives the only relief that is necessary to settle the controversy—the determination of the ownership of the property. Why the legislature cannot authorize similar procedure in like situations to meet like needs is not apparent."

And in this connection Mr. Sutherland in 16 Mich. L. R. 76 takes this optimistic view:

"But there is a second result which this procedure accomplishes in cases where coercive relief might be had, and that is a psychological one. Every case may by its means

become, in appearance at least, a friendly suit. * * *
When you ask for a declaration of right only, you treat him
(the defendant) as a gentleman.''

While most of the statutes for declaratory judgments con-
fine the power of the court to cases of actual controversy,
the Uniform Declaratory Judgments act adopted in this
state does not in terms so provide. The Florida statute is
like that, and yet the Supreme Court of the state upheld
the act as constitutional. Sheldon v. Powell, 99 Fla. 782,
128 So. 258. Seemingly the courts of Connecticut and
California would hold the same under such an act. Braman
v. Babcock, supra; Dawson v. Orange, 78 Conn. 96, 61 Atl.
101; Blakeslee v. Wilson, supra; Title etc. Co. v. Kerrigan,
150 Cal. 289, 88 Pac. 356, 8 L. R. A. (N. S.) 682, 119 Am.
St. Rep. 199. Nevertheless courts have proceeded cau-
tiously, and ordinarily will not entertain jurisdiction unless
a bona fide controversy exists, and there are parties op-
posing each other therein. In the case at bar there was an
actual controversy. So, too, some useful purpose must be
accomplished by the suit. Keriher's Petition, 284 Pa. 455,
131 Atl. 265. And see notes in A. L. R. heretofore cited,
where a number of rules are laid down applicable to cases
under the declaratory judgments act, but which need not
be mentioned here. We think that counsel's contention
should be overruled.

2. It is claimed that the court erred in not sustaining
the demurrer to the petition. Counsel argue that the var-
ious defendants could not all be joined in this action, but
that each of them should have been permitted to sue sep-
arately; that plaintiff had no cause of action, unless it was
because of multiplicity of suits, and that such multiplicity
alone did not authorize a court of equity to take jurisdic-
tion in this case. Counsel further complain that the plain-
tiffs have intermingled an action in equity with one under
the Declaratory Judgments Act, and seemingly contend
that this cannot be done. A confusion seems to exist in

counsels' mind on this subject and we shall attempt, if we can, to shed some light on it. We shall treat it from two different standpoints, namely, by considering the action as (a) one in equity, and (b) one under the Declaratory Judgments Act.

(a) It appears to be the common practice in England to combine with a request for a declaration of rights, a request for an injunction or for damages where that is obtainable and desired. 28 Yale L. J. 105. In Renwick v. Hay, 90 N. J. 148, 106 Atl. 547, 548, where the court construed an act narrower in its scope than ours, it was held that in a suit to determine the rights of the parties in certain private ways, relief might be granted by considering the case either as one in equity or as one under the declaratory judgments act. In Alfred E. Joy Co. v. Casualty Co., 98 Conn. 794, 120 Atl. 684, the court held that damages might be asked in an action for a declaration of rights, and might be given, if under such declaration it appears that the reward for such damages is proper, these having arisen under an alleged breach of contract. In the case of Patterson's Executors v. Patterson, et al., 144 Va. 113, 131 S. E. 217, the plaintiff asked for a declaration of rights under the declaratory judgments act; further, for the ratification of sales made by the executor; also that a conveyance of part of the property in controversy be ordered made to an infant, and for general relief. The court did not discuss the combination of the various matters prayed for, and it was apparently not questioned, but the case in any event illustrates the practice. In Sheldon v. Powell, 99 Fla. 782, 128 So. 258, 263, the court said:

"Except for the coercive element in the judgment or decree, we understand that there is no difference between a declaratory judgment or decree and any other judgment between opposing parties. Under the state of our statute it may be possible for the complainant to pray for a declaration of his rights and to join with their prayer one for coercive relief."

Under Section 1 of our declaratory judgments act rights and other legal relations may be declared "whether or not further relief is or could be claimed." The statute accordingly seems to contemplate that relief for declaration of rights may be considered as additional relief which courts have not ordinarily heretofore granted, and which may be granted in any action whether at law or in equity. That view is clearly borne out by the authorities heretofore cited. Plaintiff by praying for a declaration of rights merely substituted that relief for the relief ordinarily prayed in an action in equity. He did not, we think, thereby abandon his claim that the action was one in equity, in so far as the allegations in the petition justified its consideration as such. And in fact plaintiff prayed for equitable relief in addition to the relief for declaration of rights by the very fact that he prayed relief against all the defendants. If this view is correct, and we think it is, then we need but to consider whether, though a separate contract with each of the several defendants is involved, the case is nevertheless one of those coming within the jurisdiction of a court of equity.

The subject is considered at length in 21 C. J. 78-82; 10 R. C. L. 281-288; Pomeroy eq. (4th Ed.) Sections 243-275. The cases are by no means harmonious. In many cases it is held that, to justify equity jurisdiction to prevent a multiplicity of suits, there must exist a community of interest in the subject matter of the controversy and that a community of interest in the question of law and of fact involved will not be sufficient. The courts of two jurisdictions, those of Alabama and Mississippi, have not been uniform in their holding. Pomeroy, supra, Sec. 269, states as follows:

"Under the greatest diversity of circumstances, and the greatest variety of claims arising from unauthorized public acts, private tortious acts, invasion of property rights, violation of contract obligations, and notwithstanding the positive denials by some American courts, the weight of authority is simply overwhelming that the jurisdiction may

and should be exercised, either on behalf of a numerous body or separate claimants against a single party, or on behalf of a single party against such a numerous body, although there is no 'common title,' nor 'community of right' or of 'interest in the subject-matter,' among these individuals, but where there is and because there is merely a community of interest among them in the questions of law and fact involved in the general controversy, or in the kind and form of relief demanded and obtained by or against each individual member of the numerous body. * * * Courts of the highest standing and ability have repeatedly interfered and exercised this jurisdiction, where the individual claims were not only legally separate, but were separate in time, and each arose from an entirely separate and distinct transaction, simply because there was a community of interest among all the claimants in the question at issue and in the remedy.''

The view of the United States Supreme Court is well illustrated by what was said by that court in Gaines v. Chew, 2 How. 619, 642, (239) 11 L. Ed. 402 as follows:

''What shall constitute multifariousness is a matter about which there is a great diversity of opinion. In general terms, a bill is said to be multifarious, which seeks to enforce against different individuals, demands which are wholly disconnected. * * * It is well remarked by Lord Cottenham, in Campbell v. Mackay, 7 Simon 564, and in 1 Mylne & Craig 603, 'to lay down any rule, applicable universally, or to say, what constitutes multifariousness, as an abstract proposition, is, upon the authorities, utterly impossible.' Every case must be governed by its own circumstance; and as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience, in litigating matters in which they have no interest, multiplicity of suits should be avoided, by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts.''

This statement was quoted with approval in the later case of Brown v. Guarantee Trust Co., 128 U. S. 403, 410,

9 Sup. Ct. 127, 32 L. Ed. 468. The same rule was again stated in Hale v. Allinson, 188 U. S. 56, 78, 23 S. C. 244, 47 L. Ed. 380. In Commodore Point Terminal Co. v. Hudnall, (D. C.) 283 Fed. 150, 171, the court said that to warrant a suit in equity, no technical legal privity, such as joint contract, is required, and that it is sufficient if there is a community of interest in the questions of fact and law involved in the case. See also Lake Charles Rice Mill Co. v. Rice Growers' Ass'n., (C. C. A.) 295 Fed. 246.

It must be borne in mind in this connection that the principle of multifariousness is one very largely of convenience; U. S. v. Tel. Co., 128 U. S. 315, 9 S. C. 90, 32 L. Ed. 450; Brown v. Tilly, 25 R. I. 579, 57 Atl. 380. And multiplicity of suits should not be allowed where justice can be done in one. Page Trust Co. v. Godwin, 190 N. C. 512, 130 S. E. 323; Davey Tree Expert Co. v. Ackelbein, 233 Ky. 115, 25 S. W. (2d) 62; School Dist. v. School District, 112 Nebr. 867, 201 N. W. 964. It was said in Booneville Nat. Bank v. Blakey, 166 Ind. 427, 76 N. E. 529, that multifariousness does not go to that which is vital and essential, and cases are cited in 21 C. J. 411 to the effect that it is an objection which is not favored.

American Central Ins. Co. v. Knitting Mills, (C. C. A.) 39 Fed. (2d) 11, was an action for loss under insurance policies issued by seven different insurance companies. It was held that a similar provision in all the insurance policies in suit which made each insurer liable only for its proportion of the total loss, created a common interest among the insurers of such nature, extent and object as to justify assumption of jurisdiction by a court of equity of a suit on all the contracts. A number of cases of like nature are cited. Jordan v. Western Union Tel. Co., 69 Kans. 140, 76 Pac. 396, 397, was an action against 542 defendants, who had each brought suit against the Telegraph Company to recover a penalty under the statute for refusing to transmit a telegram. It was claimed that no liability existed and that the statute fixing the penalty was unconstitutional.

The court held that a suit in equity against all the defendants was proper, and among other things said:

"Here were 542 separate suits, which the petition alleged to be not only groundless, but vexatious, and brought for the purpose of annoying the plaintiff. The question is whether the actions may be maintained at all, rather than whether upon a trial of them a jury may be had. Surely, it would be inequitable to permit parties to proceed seriatim to the trial of 542 baseless and vexatious actions for the purpose of accomplishing no beneficial result. The mere multiplicity of actions might not constitute ground for the relief here sought, though we are not sure but that instances are found where courts have interfered to stay proceedings upon all but one of a like series of actions until the merits may be determined by the trial of that one. However this may be, certain it is that, if the actions are not only numerous, but vexatious and groundless, as here alleged, equity will promptly intervene."

Similar in effect is Southern Pac. R. Co. v. Robinson, et al., 132 Cal. 408, 64 Pac. 572, 12 L. R. A. N. S. 497, and I. C. R. Co. v. Baker, 155 Ky. 512, 159 S. W. 1169, 49 L. R. A. (N. S.) 496. In Bitterman v. R. Co., 207 U. S. 205, 28 S. Ct. 91, 52 L. Ed. 171, 12 Ann. Cas. 693, a bill in equity was sustained against a number of ticket brokers, to restrain them from dealing in non-transferable excursion tickets, the defenses and like legal questions applying to all. In German Alliance Insurance Com'r. v. Van Cleave, et al., 191 Ill. 410, 61 N. E. 94, an action in equity was upheld by 42 different plaintiffs against the defendant, where each of the plaintiffs had a separate right to have certain taxes refunded, the rights of each, however, depending upon the same state of facts. In Wyman v. Bowman, (C. C. A.) 127 Fed. 257, an action against a number of stockholders to recover unpaid amounts of separate subscriptions, the same rule was applied, the court discussing it interestingly and at length. In Smith v. Fire Insurance Co., 219 Ill. App. 506, 509, the court referred to the contradictory opinions on this subject, and came to the conclusion that the rule

laid down by Pomeroy, supra, is supported by the decided weight of authority and should be followed.

One of the main reasons urged against entertaining a suit in equity so as to avoid a multiplicity of suits, is that parties may thereby be deprived of trial by jury. 10 R. C. L. 284. But, as hereinafter mentioned, that reason does not apply in a case in which relief is asked under the declaratory judgments law, for the reason that provision is made for such trial in that act.

In the case at bar, the question of law involved is the same as to each defendant. That is substantially true as to the facts involved. In order to determine the price to be paid to each defendant for the beets delivered by them respectively, it was necessary, under Section 17 A—the only section of the contract in controversy—to determine the whole quantity of beets delivered and the net price received. An accounting, accordingly, was necessary, and in that respect the case bears a similarity to the case of Lake Charles Rice Milling Co. v. Rice Growers Association, supra. And surely, it would be of no benefit to the defendants to permit them to bring separate actions and have such accounting in each case. The quantity of beets delivered by the several defendants is not in dispute, and hence the total amount to be received by them respectively would, after such accounting, be a simple matter of mathematical calculation. The facts—if facts they can be called—showing any dissimilarity, were the representations claimed to have been made to the several defendants by the agents of the plaintiff. Even these representations were very similar in all the cases. And, as shown more fully hereafter, they cannot be considered herein. The contracts were each and all entered into to further a common purpose, namely, to supply to the sugar factory of the plaintiff beets sufficient to run. And that common purpose, together with the very close community of interest in the questions of law and facts herein involved, clearly justified the court, we think, in applying the principle of equity that multiplicity of ac-

tions should be avoided, and in entertaining jurisdiction herein.

(b)  Now let us consider the action purely as one under the declaratory judgments act, and we think that under that view, too, the action must be held to be maintainable. In discussing this phase of the case, we shall, though this opinion is unfortunately too long, take the liberty of digressing somewhat and referring to points that are not, perhaps, strictly necessary to be mentioned. We can hope to be pardoned for that only by reason of the fact that courts generally seem to be groping somewhat in the dark in discussing declaratory judgments, and a critical analysis of one or two phases of the subject may, accordingly, be not altogether out of place, and possibly aid others in arriving at a sounder view, if we should prove to be wrong.

Younger, L. J., said in Gray v. Speyer, 2 Chan. (1921) 549, that "these abstract declarations, whatever they may be, are neither law nor equity," while on the other hand, the author of the article in 28 Yale L. J. 111 takes the position that the equitable nature of the relief sought thereby is evident. Now the right granted to have declarations made is distinctly granted by the statute, and it would, accordingly, seem out of place not to consider the right a legal one, even though it may at the same time, in some instances, be in the nature of those heretofore denominated equitable, not forgetting, however, that in our state the "distinctions between actions at law and suits in equity" are abolished by statute. Sec. 5555, Wyo. C. S. 1920. The actual truth is, perhaps, that the statute has taken one of the steps, and perhaps a long one, the like of which have from time to time been taken in the past, to obliterate the line which has heretofore separated law from equity. Let us for a moment, though it may be unnecessary for the decision of this case, analyze the nature of the action herein, and at present without reference to the number of parties involved.

It is one founded upon the negation of a right—one asserting that the defendants' claims are unfounded. The author of the article in 28 Yale L. J. p. 12 says that it was to meet this class of cases that "the negative declaratory action was invented." The law—Section 1 of the Uniform Declaratory Judgments Act—expressly recognizes the right to bring such actions, for it specifically states that "the declaration may be either affirmative or negative in form and effect," and it further states that the mere fact that no relief other than the declaration of right could be claimed cannot be raised as an objection to the action. It may be—though we are not certain—that the statute has here created a primary as distinguished from a remedial right. 16 Mich. L. R. 77. Whatever it be, a new right has been granted, and this right, now a legal right under the law, is equitable in nature, by reason of the fact that actions brought pursuant thereto are in the nature of bills of peace. In Guaranty Trust Company v. Hannay & Company, 2 K. B. 536 (1915), 12 A. L. R. 1, construing a law, or rather rule, narrower in its scope than our law, Pickford, L. J., said:

"I think that a declaration that a person is not liable in an existing or possible action is one that will hardly ever be made, but that in practically every case the person asking it will be left to set up his defense in the action when it is brought, * * * but * * * I am not prepared to say that it is beyond the power of the court in a very exceptional case to make such a declaration, and that the fact of its being asked for a purpose which the court does not approve does not take away the power to make it, but only gives reason to refuse it. I think, therefore, that there is jurisdiction to make this declaration."

The court, however, held that the circumstances in that case did not justify the exercise of jurisdiction, Pickford, L. J., suggesting that if the plaintiff had shown a case of vexatious litigation it would have been different. It may be remarked, in passing, that the learned judge evidently did not have in mind the numerous cases, heretofore

brought as actions in equity, for the specific purpose of determining that the plaintiff was "not liable in an existing or possible actions."

Our law, as already indicated, is more specific in recognizing the power of the court to make a declaration of right negative in form than the English rule. There will, of course, be many cases, where such declaration would subserve no good purpose. It may, for instance, be that if an action such as in the case at bar were against only one defendant, courts might be disposed to leave the parties to what has heretofore been considered the ordinary course of procedure, although we are not sure of that in view of Baumann v. Baumann, 222 App. Div. 460, 226 N. Y. S. 576, where it was substantially held that the court should not refuse to entertain an action under the declaratory judgments act, even though one under the ordinary procedure would accomplish the same ultimate result. In any event, we think it is clear that the court has power to entertain an action of this nature, at least when no rules as to parties or joinder of different causes of action interfere, and we shall now proceed to consider that phase of the case.

If the declaratory judgments act were definite in regard to joinder of parties, when there is a community of interest in the questions of fact and law involved, we should need to go no further. It does not, however, specifically provide for such a case. We are inclined to the view that Section 11 permits such a joinder in such a case, particularly if construed liberally, as it must be, and in the light of the statutes already existing which permit joinder of parties in many cases, as was done by the Supreme Court in Kentucky, though in another connection, in the case of I. C. R. Co. v. Baker, 155 Ky. 512, 520, 159 S. W. 1169, 49 L. R. A. (N. S.) 496. Much of what is said in the briefs of counsel for the defendants seems to favor this view, though we are not certain of that. Let us, however, assume that such construction would be too strained. Then, in order that the action herein may be held to be maintainable, if at

all, on the present theory, it can only be by calling equity to our aid, namely, the principle already discussed that, in order to avoid multiplicity of suits, joinder of parties, though different contracts are involved, is permitted when a community of interest in the facts and the law involved exists. Can we call that principle to our aid in an action (at law) under the declaratory judgments act? What hinders the court from doing so, or rather under what principle can the court refuse to do so? Of course if the law forbids, it must prevail. See 21 C. J. 195-197. But the declaratory judgments act, and our other acts as to joinder of parties, if they do not require, do at least not forbid, the application of the principle of equity above mentioned in an action under it. As already stated, the line between law and equity has been more or less obliterated in the past. Courts frequently apply principles of equity in actions at law. Pomeroy, eq. (4th Ed.) Sections 42-69. Courts have numberless times announced that rules of equity and of law may be applied in the same action. Decennial Dig., "Actions," 25(3). Speaking of Code provisions prior to the adoption of the declaratory judgments act, Pomeroy's Code Remedies (5th Ed.) Sec. 50, states:

"The intention plainly shown in the various State codes of procedure is to adopt the general equity theory of parties rather than the legal theory, and to apply it to the single civil action in all cases, whatever be the nature of the primary right to be protected or of the remedy to be obtained."

And the significant statement is made in Adams v. Bank, (Tex. Civ. App.) 178 S. W. 993, 996:

"One of the reasons for giving our courts both legal and equitable jurisdiction was that the equitable doctrine as to the avoidance of a multiplicity of suits might be enforced."

If that was true heretofore, it would seem to be much more so under the declaratory judgments act, particularly

in an action like that at bar, which, as already stated, is in its essential nature one of those that have heretofore been denominated equitable. Some generations ago, principles of equity were administered only by courts of equity. But our courts administer both equity and law. Heretofore an action in equity, without the right of trial by jury, was necessary in order to enforce the principle against multiplicity of actions. But surely the *principle* exists without reference to the court in which it is applied or the particular form in which it may be administered; and though a case may in some respects require the application of a principle of equity, it does not on that account necessarily lose the characteristics of an action at law. And simply because the court without a jury must determine whether the rule against multiplicity of actions is applicable, does not, we think, hinder the determination of the facts in the case by a jury, as is provided for in Section 9 of the declaratory judgments act. In the instant case, a number of parties, though having separate contracts, have a community of interest in the facts and the law involved herein. That, under the circumstances of this case, gave rise to the application of the principle of equity that a multiplicity of actions should be avoided by joining all in one suit. But the action may, nevertheless, be called one (at law if you please) under the declaratory judgments act. An action thereunder is not one heretofore known (except to a limited extent), and if a plaintiff invokes that act, he must submit to its terms. The facts in the case, in so far as material, might, accordingly, have been submitted to a jury, had that been demanded. Not having been demanded, as is required in other cases, the defendants were not prejudiced.

One more point in this connection. Counsel for the defendants complain that the court went further than the mere construction of the contract, and determined other points, for instance, that plaintiff was not guilty of want of care in its connection with the contract in suit, without,

however, questioning the correctness of the findings of the court. These points related to the liability of the plaintiff under the contract. Counsel seem to be under the impression that the declaratory judgments act only permits the construction of the contract. In this they are in error. Section 2 of the act—without reference to other sections—specifically permits not only the construction of a contract, but also the determination of rights and other legal relations thereunder, which, of course, would include liability thereunder.

3. We come then to the construction to be placed upon the section of the contract in controversy here, namely, Section 17 A, reading as follows:

"It is further understood and agreed that the Corporation will pay as high a price for beets delivered any year during the term of this contract as any legitimate price paid for beets delivered by any other company or manufacturer operating in the States of Colorado, Wyoming or Nebraska, but in no event shall the Corporation be required to meet ruinous competitive prices made by any company or manufacturer for the purpose of injuring the business of the Corporation, and any price per ton of beets paid by any competitive company or manufacturer that will represent a sum in excess of the net price received for (50%) fifty per cent of the sugar in the bag produced from said ton of beets shall be considered a ruinous competitive price and unfair competition. In arriving at the sugar produced from a ton of beets the total sugar produced at North Platte Valley plants of the Corporation and the total tons of beets bought for delivery to North Platte Valley plants of the Corporation shall be considered. This clause shall not operate to reduce the schedule as provided for in the foregoing contract."

It was agreed that the Great Western Sugar Company paid eight dollars per ton for the beets delivered to it during 1926 at its factory in Nebraska, which was but a short distance from Torrington. Great stress is laid upon this fact, as showing the unlikelihood that the defendants would

raise their beets for a less sum. On the other hand it appears that the plaintiff, in the spring of 1926, was proceeding to construct a factory at Torrington, making it perhaps more cautious than usual in entering a comparatively new field, or, perhaps, causing it to assume that it was warranted in paying a price somewhat less than paid at other places,—which was shown to be true—because of the expected increase or value of the property at and in the vicinity of Torrington by reason of the erection of the factory. Most of the testimony in the case relates to statements made by the agents of plaintiff at the time and in connection with the contracts in question. This testimony was contradicted, but we may assume, for the purpose of this case, that this was not done. We need not consider all of the statements, but only those upon which stress is laid and which are claimed to have a material bearing herein. These, according to the testimony, were substantially to the effect that defendants would get for their beets the same price as paid by the Great Western Sugar Company—that is to say, at least $8.00 per ton—or to the effect that defendants would receive the same price paid by the latter company, unless that would be ruinous, but that $8.00 per ton would not be ruinous.

While defendants pleaded that fraudulent representations were made, they asked for no relief on that account, and they specifically disclaim herein that they are entitled to be relieved from the terms of the written contract by reason of fraud or mistake; they stand upon the written contract as made, claim under no oral contract and simply contend that the representations made were admissible for the purpose ''to show the court the conditions, circumstances and surroundings under which the contracts were executed'' and ''for the purpose of showing the interpretation and construction which the plaintiff's agents placed upon the ambiguous paragraph of the contract; this and nothing more.'' With this situation thus clarified, let us proceed.

We are cited to a number of rules of construction; for instance, that in case of doubt, a contract will be construed most strongly against the party drafting it. Those cited to us are subsidiary rules, and we fear that counsel have laid too much stress upon them, and have dwelt lightly upon or ignored the main rules to which those cited by counsel are but secondary. We must not lose sight of the rule, fundamentally embedded in our jurisprudence, that, though testimony may frequently shed light on the terms employed, a contract, once reduced to writing, cannot be contradicted, altered, added to or varied by parol or extrinsic evidence. 22 C. J. 1070; 6 R. C. L. 839; Jones, Ev. (2nd Ed.) Sec. 1539. Oral statements made by the parties at or previous to the time of the execution of a written instrument may at times be shown as part of the surrounding facts (Jones, supra, Sec. 1559), but never to contradict or vary its terms, and the admissibility thereof is in any event limited to exceptional cases, not necessary to be mentioned and not applicable here. As stated in Wigmore, Evidence (2nd Ed.) Sec. 2425:

"When a jural act is embodied in a single memorial, all other utterances of the parties on that topic are legally immaterial for the purpose of determining what are the terms of their act."

See also Section 2471 of the same work.

Part of the testimony, as already mentioned, related to statements that the defendants would get the sum of $8.00 per ton of beets; in other words, that the contract in question was an unconditional contract for the payment of that sum. This was an attempt to interpret the meaning of the contract and state the legal effect thereof. The rule, however, is fundamental, that the legal effect of a written contract cannot be contradicted, changed or explained by extrinsic proof. Nichols, Applied Evidence 2, 1256; 22 C. J. 1975. A "conscious misstatement of the meaning of certain terms in a written contract has been held immaterial."

Williston on Contracts, Sec. 1495. In Kansas Wheat Growers Ass'n. v. Floyd, 116 Kan. 522, 227 Pac. 336, 337, such misstatements were even held not to amount to fraud. The defendants in that case had made a contract with plaintiff to deliver their wheat to the latter, and to receive therefor the resale price, less certain expenses. One of the defendants attempted to show fraudulent representations upon which he replied, testifying:

"When I signed the contract they said they would pay me $1.00 a bushel or whatever the local elevator would pay me, and at the end of the year they would pay me a dividend on that. I found out that they would not do that and under these circumstances, if the wheat was not mortgaged, I could not afford to deliver it to them."

The Supreme Court of Kansas said:

"That did not amount to a representation of a then existing fact. The representation was a promise of what would be done in the future and was not sufficient to constitute a fraud."

In the case of Providence Jewelry Co. v. Bailley, 159 Mich. 285, 123 N. W. 1117, 1118, the plaintiff sold certain jewelry to the defendant at certain prices and with certain discounts for cash, and "the above terms of credit will only be allowed if acceptances to our order are given within 15 days from date of invoice." The plaintiff claimed that the agent of plaintiff represented that the term "acceptance in 15 days" meant that he, the defendant, had 15 days in which to examine the goods, and return them if then found unsatisfactory. The Supreme Court held that this evidence was inadmissible, for the reason:

"That the statements of the agent in this regard were not such representations of existing material facts as to constitute an inducement upon which defendant had a right to rely, and were incompetent, as tending to vary the terms of the written contract."

And in Tradesman Co. v. Mfg. Co., 147 Mich. 702, 111 N. W. 343, 344, 112 N. W. 708, the court, holding evidence of certain representations incompetent, said:

"The alleged fraudulent representations were in substance statements of the effect of the contract, and of the defendant's rights thereunder, the result of proof of which would be to make a different contract than that executed by the parties. They were not such false representations of existing material facts as to avoid the contract."

See further: Clem v. R. R. Co., 9 Ind. 488, 68 Am. Dec. 653; The New etc. R. R. Co. v. Fields, 10 Ind. 187; Jagger v. Winslow, 30 Minn. 263, 15 N. W. 242.

The case at bar is stronger. The testimony that the defendants were to receive the sum of $8.00 per ton unconditionally flies directly in the face of the written contract. For while the first clause of Section 17 A states that the plaintiff would meet competition, the succeeding parts of the section define the circumstances and affix a limitation, and virtually a condition, under which that would be done. If a man promises anything to another, if so or so happens or exists, the "if" clause is of vital importance and such other cannot ignore it and make an unconditional promise out of it. No more can a writing that contains a conditional promise be changed to an unconditional one by parol. That to do so would vary the written contract appears to be so clear as to be, in our opinion, not open to argument. But counsel say that "a party who has induced another to act upon a certain understanding of a contract cannot, after the other has acted, deny that understanding to the other's loss." They cite Brent v. Lilly Co., (C. C.) 174 Fed. 877; Scully v. U. S., (D. C.) 197 Fed. 327; Grunden-Martin Mfg. Co. v. Christie, 22 Ariz. 254, 196 Pac. 454. The principle so stated is applicable in the proper case. Space forbids us to analyze the cases cited, and we must content ourselves by stating that they have no application here. It is, moreover, urged that the court should adopt

the rule which would not work a hardship on the parties. Evidence was introduced to show that none of the defendants were able to raise beets at the price paid by plaintiff; that each of them lost money, and that if the construction placed on the contract by the lower court should prevail "it amounts to an overwhelming calamity." We should, of course, not be the last to prevent that, if we could do so consistent with our duty, but if counsels' contention is right and the oral statements that the plaintiff would pay $8.00 were accepted in the face of the written contract, it would mean, we think, the virtual abrogation of the parol-evidence rule, though counsel, doubtless, would be among the first to deprecate any such result. And we might add that their contention that the plaintiff should have shown that it would have sustained loss if it had paid $8.00 per ton, and that the absence of testimony in that regard should be taken into consideration, seems hardly to be justified, even if material, in view of the fact that the parties agreed in advance as to what should constitute the payment of a ruinous price by the plaintiff.

It is further argued that the defendants could at no time have received $8.00 per ton under the terms of Section 17 A, except in cases where at the same time they would have received more under the other provisions of the contract. A table has been prepared and inserted in the brief to show this. However, a table is inserted in plaintiff's brief showing this to be untrue at least in certain cases. But even if defendants' contention were true, we cannot perceive the force of it. Section 17 A does not contain a promise of the sum of $8.00 per ton, but fixes the condition under which plaintiff would meet competition and that up to a certain limit. If the sum of $8.00 per ton would never be paid under that section, according to the representations of plaintiff's agents, that but shows that these representations would in that respect vary and contradict the written contract, and for that reason would be inadmissible. Nor can we perceive, how counsel can say that in this view of the

matter the provisions of the foregoing section were nothing but a "delusion and a snare." The table set out in the defendants' brief itself shows that under a number of conditions that might arise, the defendants, while not receiving $8.00 per ton, would have been materially benefitted, and would have received a sum, in some cases, much in excess of the sum of $6.00 per ton, and the epithet applied can, accordingly, be hardly considered appropriate.

The only testimony, other than that already discussed, of any importance herein, was that which related to the representations that the sum of $8.00 per ton was not ruinous, in connection with the statement that the plaintiff would pay the same price as the Great Western Sugar Company, unless it was ruinous. That, too, was immaterial and incompetent. The contract itself expressly provided the conditions under which the price should be deemed ruinous. It was dependent on the net price to be received and the amount of sugar in the beets,—conditions which could not be foretold any better by the agents of the plaintiff than the witnesses who testified. Any statement on these matters could at best be but an opinion of what would happen in the future, and could at most be approximate only as to the result, for to foretell the market conditions months in advance has always been known to be hazardous—a fact too vividly realized of late by millions of men. And in attempting to foretell the bounty of nature—in imparting the sugar content of beets—we should not forget that seven lean years are apt to follow seven that were fat.

No testimony was offered to interpret other disputed points of Section A, and these must, accordingly, be determined from the writing itself. Two contentions are made in that connection:

(a) It is claimed that it was incumbent on the plaintiff to prove by testimony that the price paid by the Great Western Sugar Company was paid for *the specific purpose of injuring the business of the plaintiff*. The clause which mentions such purpose is followed by one which defines

what shall constitute a "ruinous competitive price and unfair competition." When a competitor fixes a ruinous price for his commodity and is at the same time guilty of unfair competition, no benevolent motives can be attributed to him, but the contrary may be fairly inferred therefrom, and the clause which defines what shall constitute a ruinous, competitive price and unfair competition is, we think, clearly intended as the standard by which the requirements in the preceding clause should be judged; otherwise that definition would be evidently almost wholly useless, and we cannot so construe it.

(b) It is further argued that the clause which states as to what should constitute a ruinous, competitive price should be determined by the net price received for 50% of the sugar in the bag produced from beets delivered to the Great Western Sugar Company, and no testimony on that point was introduced. The strict grammatical construction of the sentence, standing by itself, perhaps conveys that meaning. But it cannot be read apart from that which follows, and that definitely excludes the construction for which the defendants contend. Two factors were to determine the question of a ruinous price: (a) the net price received for (b) fifty per cent of the sugar in the bag produced from a ton of beets. The latter factor was to be determined by considering the total tons of beets delivered to or bought by the plaintiff, evidently to arrive at the average quantity of beets required to produce a bag of sugar. The beets, accordingly, delivered to the Great Western Sugar Company could not be considered. This clause is not discussed in the defendant's brief, but we are unable to see how it can be explained away. This construction is borne out by Section 7 of the contract, which provides: "The sugar content of the beets grown hereunder shall be determined by taking the average of the tests made of all beets sliced in the factory of the corporation." It is not likely that Section 17 A was intended, without being more specific, to directly contradict Section 7. Furthermore, it is

not very probable that one company would want to set the standard of the price to be paid by it for beets, to be determined by the price paid by its competitor, especially by a competitor particularly feared, as in this case. If we assume, on the one hand, that the sugar content of the beets delivered to the Great Western Sugar Company was the same as that of the beets delivered to the plaintiff, then if any difference in the payment of the price paid by the former had been possible without violating the clause of the contract now under consideration, that situation could have arisen only, or substantially only, by reason of the ability of extracting from its beets a greater amount of sugar than would have been possible for the plaintiff; but we cannot assume that to be true in view of the finding of the trial court that there was no lack of care in that respect on the part of the plaintiff. If we assume, on the other hand, that the sugar-content of the beets delivered to the Great Western Sugar Company was higher than that of the beets delivered to the plaintiff, and this content was intended as a factor in determining the price to be paid to defendants, it would seem strange that plaintiff made no provision for such a contingency. Counsel, as already stated, have referred to the unfortunate result that would ensue, if their construction of Section 17 A were rejected. Whether they meant to also refer to the part of the contract now being considered is not clear. If they did, then it may be said in the first place, if it is material, that the record fails to disclose any testimony on the part of any of the defendants that any representations were made giving the clause under consideration the meaning now contended for by counsel for defendants, and in the second place, the fear of such unfortunate result would be based on the gratuitous assumption that the $8.00 per ton, paid by the Great Western Sugar Company did not exceed the ''net price received for fifty per cent of the sugar in the bag'' produced from a ton of beets delivered to it—an assumption which, in view of the evidence which shows only a small difference in the

sugar content of beets raised in Nebraska, Wyoming, and Colorado, is in all likelihood not warranted, or is at least problematical. In short, taking Section 17 A by its four corners, and construing it as a whole, we do not consider it ambiguous, and oral testimony to explain it was accordingly incompetent (22 C. J. 1189), though we have discussed various phases in connection therewith at length in deference to the earnest contentions made by counsel herein. And in view of the fact that the testimony discloses that the defendants have been paid the minimum price fixed in the contract, which is more than the net price received for 50 per cent of the sugar in the bag, it is clear that nothing more is due or owing the defendants under the written contract.

4. Counsel for defendants argue that there was a defect of parties, inasmuch as Section 11 of the declaratory judgments act requires that all parties affected by the declaration shall be made parties. The defect was raised by demurrer, but since the petition did not disclose it, the demurrer was properly overruled so far as that ground is concerned. Thereafter defendants pleaded the defect in their answers and this plea was stricken on motion of plaintiff. Just upon what theory the motion was made and sustained we do not know. It is certain that if other parties were interested in this controversy, they were at least proper parties, and when a plaintiff comes into court and asks relief under the Declaratory Judgments Act, he should conform to its provisions. That 48 defendants could not be served in Goshen County does not show that no jurisdiction could have been obtained over them. Section 5624, Wyo. C. S. 1920. The section just mentioned was discussed in the case of Morton v. Pacific Const. Co., (Ariz.) 283 Pac. 281, and it was held that the trial court abused its discretion in not requiring all persons interested in the controversy, including non-residents, to be made parties. There, however, the controversy related to property, and it is pointed out that the rule would not apply in cases where

personal judgment is sought in an action. The court conceded that Section 11 of the act is not mandatory, evidently in view of the sentence providing that parties not summoned shall not be affected by the declaration, but held that the court, under Section 6 of the act, may in its discretion refuse to hear a case, unless all interested parties are brought in, that discretion being abused in the case before the court. If we follow the reasoning in that case, we should hold, as we do, that in view of the fact that a personal judgment was asked in the case at bar, the court did not abuse its discretion in refusing to have other parties brought in. The controversy herein could and was fully disposed of so far as the parties were concerned who were in court. They could not well be prejudiced by the fact that other parties were not brought in. In addition, it is doubtful that at least some of the answers were sufficient in form on this point so as to come within the rule laid down in 47 C. J. 196-197, but it is not necessary to go into that.

5. It is argued that the change of venue from Goshen to Laramie county was prematurely made and that it was error that thereafter the regularly elected judge of the first judicial district (including Laramie County) did not try the case but called in the Hon. V. J. Tidball, Judge of the Second Judicial District, we find no specification of error in this regard in the record. The only thing that can relate to it at all is specification of error 5, reading: "The court erred in that, proceeding with the trial of said action and overruling the objections of said defendants made on the ground that the court had no jurisdiction of said action—Record on Appeal page 51." We could in no event consider anything under this assignment other than a jurisdictional question. The plaintiff had an absolute right to have a change of venue from Goshen County upon certain grounds (Section 6419, Wyo. C. S. 1920), and simply because it was granted prematurely could not be jurisdictional and could at most be erroneous. The change of judge

was apparently granted by the judge of the first judicial district on his own motion in accordance with Section 1139, Wyo. C. S. 1920. That, at least, is indicated by the order for change, although an application therefor was filed by the plaintiff. If there was any error in this respect, it was not jurisdictional.

6. Other points covered by the specifications of error are not argued. Counsel say in their brief: "Assignment Nos. 6 to 42 inclusive relate to the rulings of the court on the admissibility of evidence. It would burden the court for us to discuss separately each of these assignments; therefore we submit them upon the objections as stated in the record in this cause." To show how little light we have on these points, we may take assignment of error No. 6. It relates to the introduction of certain documents in evidence, and the only thing that counsel had to say at the trial was "We would like an exception." The assignments of error above mentioned must be deemed to be abandoned.

7. We come now to the appeal of plaintiff. This, we think, may be disposed of briefly. The court made all the declarations asked for in the petition, namely: (1) That a price of $8.00 per ton of beets was a ruinous price; (2) that the proper and full price of beets under plaintiff's written contracts with the defendants was $6.00 per ton; (3) that plaintiff was not negligent in its connection with said contract, so as to damage the defendants; (4) that the matters decided should be *res judicata* between the plaintiff and the several defendants. As we understand the decree, the court refused to consider whether some of the defendants might not, in the proper action, have their contract with the plaintiff reformed and recover upon an oral, or reformed, contract, by reason of fraudulent representations of such character as to warrant the court in decreeing a reformation. The plaintiff complains of this refusal.

The suit herein was to construe the written contracts mentioned in the petition, and determine the liability of the plaintiff thereunder. It would be no error, in such a case, for the court to refuse to decide the claims which are based on an altogether different contract, and if the pleadings disclose that particular defendants repudiate the written contract in suit, and set up facts sufficient to warrant the reformation thereof, such defendants and their claims may, we think, be properly excluded from the case. Under such a state of facts, the defendants would each have a suit different from that of the others, each depending on its own facts, and courts have never sanctioned a rule that numerous suits, each depending on its own facts, should be decided in one action. Parties are permitted to be joined so as to avoid a multiplicity of suits only where there is a community of interest at least in the questions of fact and of law involved. So, as said by Pomeroy, supra, Sec. 251½:

"The equity suit must result in a simplication or consolidation of the issues; if, after the numerous parties are joined, there still remain separate issues to be tried between each of them and the single defendant or plaintiff, nothing has been gained by the court of equity's assuming jurisdiction."

And a like rule would undoubtedly apply by considering this action as purely an action under the declaratory judgments act. Section 6 of that act states:

"The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

As further shown by the notes in A. L. R. already mentioned, courts have discretionary power as to whether to entertain a suit under the declaratory judgment act, and that discretion, we doubt not, is broad enough so as to authorize the exclusion of some of the defendants from a suit

like that in the case at bar, if it appears that their claims are separate and distinct from those of the others. And it may be that such power should, perhaps, be construed to be sufficiently broad, so that, if any practical result may be reached thereby, the court, instead of excluding a party or parties from the suit entirely, may adjudicate such issues as apply to all. But to go as far as counsel for the plaintiff would have the courts go, would subserve no practical purpose and might result in much unnecessary vexation for the individual defendants.

As a matter of fact, however, no issue relating to any contracts other than those mentioned in the petition arose in the case. We have already noted the broad disclaimer in that regard by counsel for the defendants. They never relied on anything except the written contracts. That was, perhaps, not so clear at the time of the trial, and the trial court as well as counsel for the plaintiff evidently were led into a misconstruction of the situation. As we read the answer of the defendants, they stand upon the written contract. They claim, however, that the contract bears a certain meaning (which we have held to be incorrect) in the light of certain representations. The representations pleaded are substantially those herein already discussed, and which, as a matter of law, cannot, as we have heretofore stated, vary or contradict the meaning of the written contract as we have interpreted it. In view of this situation the statements in the decree in connection with the refusal above mentioned may be treated as surplusage.

One additional point should, perhaps, be mentioned. The court seemingly refused to pass on the effect of the representations testified to on the interpretation of the contract. Whether it should have done so or not is immaterial herein in view of the fact that we were perforce required to pass on that identical point in connection with the appeal of the defendants. In order to harmonize the decree with this opinion it is, perhaps, better, to modify the decree by striking therefrom all reference to any reservation of decision as

to the effect of any oral representations on the interpretation of the written contracts in suit. As so modified the decree will be affirmed, the respective parties in the case to pay their own costs in this court.

*Modified and affirmed.*

KIMBALL, Ch. J., and RINER, J., concur.