Argued November 21, 1946; affirmed January 14; rehearing
denied February 18, 1947

# CONSOLIDATED FREIGHTWAYS, Inc. *v.* FLAGG
## (176 P. (2d) 239, 177 P. (2d) 422)

*Donald A. Schafer,* of Portland (Schafer & Holbrook, of Portland, on brief), for appellant.

*Rex Kimmell,* Assistant Attorney General, of Salem, for respondent.

Before Belt, C. J.,* and Rossman, Kelly, Bailey, Lusk and Hay, Justices.

ROSSMAN, C. J. †

This is an appeal by the plaintiff from a decree of the circuit court which holds that moneys paid to the plaintiff for transportation services rendered by it to the United States Army in the fall of 1943 were a part of its "gross earnings", as that term is defined in § 115-517, O. C. L. A., and that they were subject to the tax imposed by other provisions of § 115-517.

This proceeding was instituted under §§ 6-601 to 6-616, O. C. L. A. (Uniform Declaratory Judgments Act) for the purpose of securing a judicial declaration as to whether or not the sums above mentioned were a part of the plaintiff's gross earnings and were taxable as such. The defendant is the Public Utilities Commissioner, who is the official charged with the collection of the tax.

The first assignment of error says:

"The Court erred in finding as a fact 'that the waiting time is a part of the pick-up and delivery service * * *' because such finding is contrary to the evidence and effects a result not intended by the Legislature."

---

* Chief Justice when this case was argued.
† Chief Justice when this opinion was rendered.

The second assignment of error is:

"The Court erred in construing the facts and the statute in a manner which brings about the taxation of revenues not clearly and specifically mentioned by the Legislature and in failing to construe the facts and the statute strictly according to the clear import of the language used."

The appellant is a motor freight common carrier within the purview of our Motor Transportation Act, §§ 115-501 to 115-537, O. C. L. A. Section 115-517 says:

"In addition to the license fees or taxes otherwise imposed by law upon common carriers and contract carriers there shall be assessed against and collected from every such carrier a tax of one (1) mill per combined weight ton mile on the public highways, * * * for the use of said highways, to apply on the cost of the administration of this act, and for the maintenance, repair and reconstruction of public highways. * * * provided further, that contract and common carriers may, at their option, in lieu of the tax or charge provided for in section 115-517, be assessed and pay on all operations of such carrier over the public highways of the state, monthly, on or before the twentieth day of the month following the month for which the tax is incurred, to the commissioner, a privilege tax for the use of the public highways in a sum or amount equal to 6 per cent of the gross earnings from the operation of such motor carrier and each thereof within this state, * * *. The term 'gross earnings' shall include all sums earned for the transportation of persons and/or property over the public highways of the state and also such sums earned for loading and unloading in connection therewith, and including also pick-up and delivery charges."

The appellant chose to have its tax computed under the optional method, that is, upon its gross earnings.

In September, October and November of 1943 the United States Army, while conducting war training maneuvers in Central Oregon, engaged the services of the appellant to transport daily 100 tons of supplies from Terminal No. 4, in Portland, through Bend to some flexible points in Central Oregon which were deemed truck heads. The appellant's part was to furnish the necessary trucks and drivers. For its services it charged a flat rate per hour under tariff provisions compiled by it which we shall shortly quote. The charge began when the truck reached Terminal No. 4 and continued until it returned from Central Oregon to that terminal, except for periods when the vehicle was disabled or the driver was off duty. In reporting to the commissioner the amount of its gross earnings, the appellant did not include the amount paid for periods in which the trucks stood idle in Portland awaiting loading, nor while they remained in Bend and other Central Oregon places awaiting orders to proceed to truck heads. The appellant's charges were made under its freight tariff, which reads, in part:

> "The hourly rates named in item 35 include the transportation, waiting time, loading, unloading, stopping in transit, and all other accessorial services in connection with the loaded movement."

Item 35 reads as follows:

> "Hourly Rates—Rates and charges for the transportation of commodities as described in Item 10 shall be as follows  *  *  *."

The circuit court held that the sums paid to the appellant for the waiting periods constituted a part of its gross earnings, as that term is employed in the parts of § 115-517 which we quoted. The sole issue presented by this appeal is whether or not the court erred in so construing and applying the statute.

The evidence is free from dispute. Mr. J. A. Babic, the appellant's operation manager, explained in the testimony which we shall now quote how it happened that the trucks were kept waiting in Portland for extended periods of time:

"The army called for trucks as they required them. They loaded the vehicles under our supervision. The job was so large that it was impossible to load all the vehicles going to the same point at the same time, so they required us to have as many trucks as they felt were needed to go to any one point at the same time, even though they couldn't load them for 5 or 6 or 7 or 8 hours. The first week of the operation they required us to convoy movement from Portland, Oregon, to Bend, Oregon. They required us to assemble each of the groups of vehicles in Portland and proceed in convoy to Bend. It was later discontinued because it wasn't practical. At Bend, Oregon, the vehicles arrived at a central check station, Central dispatch station, and were assembled at that point and were convoyed to the various group units or truck head units as they were called by army personnel.

\*　　　\*　　　\*　　　\*　　　\*

"Q. What was the average waiting time of the truck at Warehouse 4, or army terminal 4?

"A. It was approximately 4 to 6 hours.

"Q. What was the occasion of that length of time?

"A. The waiting was occasioned by the insistence of the army to have vehicles available for loading, even though they couldn't load the vehicles when they were there. They wanted to have the trucks in the yard and they wanted to see them there so that they would be certain they had the trucks, and also to organize the loading so that the subsistence items for one camp would be loaded within a space of 4, 5, 6 or 7 hours, so as to keep the vehicles more or less loaded together.

"Q. Now, this time of 4 to 6 hours, how much of that time was consumed by loading?

"A. Well, the 4 to 6 hours approximately one and half to two hours was consumed in loading."

Mr. Babic explained that the waiting time at Bend "was incurred because vehicles would move to a designated truck head, which truck head very often was not known but an hour or two before departure of the trucks from Bend, and very often the trucks arrived at the truck head before the troops got there who were to unload the vehicles."

Mr. W. S. Myrin, who, in 1943, was superintendent of the Eastern and Central Oregon division of the plaintiff, explained in the following testimony why the trucks stood idle in Bend at times for extended periods:

"Q. I want to know how long a time those trucks stood idle at Bend before you were able to dispatch them to the truck heads.

"A. Oh, I would say the average time was about 6 hours.

"Q. Were these trucks dispatched to the truck heads in the order in which they came into Bend?

"A. Not necessarily.

"Q. By what method were they dispatched?

"A. They were dispatched in a group. In other words, there would be two or three, or maybe four, trucks and trailers, or semis, loaded for a particular division or group who would be located at a truck head, and those vehicles would move in a convoy to the truck head.

\*      \*      \*      \*      \*

"Q. You spoke about them being assembled there some place in Bend.

"A. Yes, there was a place set aside.

"Q. Provided for them?

"A. Provided for them.

"Q. Where was that place? I don't mean the street number or anything of that kind, but was it

in the street or was it in the field, or where was it? The warehouse or where?

"A. Well, some of it was in the street. Occasionally some of them were down in our own terminal yard, and again others of them were—the street ended down there in that particular spot, and they were kind of off in the dirt and up on the side where the street would have been."

After the trucks left Bend, waiting periods were sometimes incurred due to impassable roads, lack of army personnel available for convoy duty and the Army's request that trucks should not reach the truck heads until darkness.

The above is a sufficient statement of the facts.

■ The tax with which we are concerned, as appears from the words of the statute previously quoted, is a "privilege tax" and is imposed upon "gross earnings" derived from services rendered in loading, unloading, transporting, picking up and delivering freight. Since the appellant reported to the commissioner every dollar received from the Army, except sums paid for periods when its trucks were awaiting loading or instructions, the sole question before us is whether or not the withheld sums were earned in transporting, loading, unloading, picking up or delivering cargo.

The appellant argues that a truck which is standing idle awaiting the time when it will be loaded or will be given instructions for its future movement, is not engaged in the transportation, loading or unloading of freight. It claims that such a situation is similar to the demurrage of a vessel or a railway car. The record does not indicate whether or not the appellant's tariffs make provision for demurrage. Such charges, according to our understanding, are separate and apart from those made for loading, unloading and transpor-

tation. We have already mentioned the provision in the appellant's tariff under which it collected the money which the respondent seeks to tax, and which says:

> "The hourly rates * * * include * * * waiting time * * * stopping in transit, and all other accessorial services in connection with the loaded movement."

Seemingly that provision repels any suggestion that the appellant could have charged the Army separately for the waiting periods.

The waiting periods described by the evidence apparently were not of the demurrage type, but were due to the peculiar nature of the service which the Army wished rendered. It wanted to have trucks loaded in special formations and also wanted the vehicles to proceed from Bend in patterns which would conform with the troop movements. A railway car, subject to demurrage charges, is in the custody of the shipper while it stands upon his siding; but the appellant's vehicles were at all of the times with which we are concerned in the immediate custody of the appellant's drivers. In fact, for the periods in which the driver was absent no charge was made to the Army, according to Mr. Babic, whose exact words were:

> "The charge included all the time the vehicle was in the service of the Army except for the time that the vehicle might have been broken down or the operator of the vehicle was off duty taking a rest."

It is not always practical in the drafting of tax statutes to detail with precision every item which it is proposed to tax or exempt. Business methods, mercantile terminology and accounting practices vary in dif-

ferent establishments, and, therefore, no single term or phrase may suffice to name an item which the legislator has in mind. Then, too, business methods are generally in a state of flux, and accordingly precise language adapted to today's methods may enable those whom it is sought to tax to escape the levy by slightly changing their methods, practices or tariff schedules.

■■ The packaging of ideas, whether in the writing of a statute or of a book, involves the selection of words. If those who later encounter the words know what is intended, the writing has served its purpose. Today it often happens that legislation which concerns businesses subject to the control of administrative agencies is drafted in consultation with agency officials who, through the course of the years, have gained familiarity with the usages and practices of the businesses under their supervision. In instances of that kind, the language of a statute, say that of a tax statute, is that of men who have become acquainted with the business's idioms. It is obvious from the appellant's tariff that those who are engaged in the transportation business do not employ the word "transportation" in its literal sense, but in a practical signification wherein it includes within its meaning "waiting time, loading, unloading, stopping in transit, and all other accessorial services in connection with the loaded movement." We are satisfied that the word "transportation", as it appears in the definition given by § 115-517 to the term "gross earnings", is used in the practical sense in which transportation men employ it. In placing upon that word the same practical meaning which the appellant itself uses, we do no violence to the rule which construes taxation statutes strictly.

■ It is true, as the appellant's first assignment of

error indicates, that the memorandum opinion of the circuit court judge expressed a belief that the "waiting time is a part of the pick-up and delivery service." We believe that that detail of the opinion was unnecessary. The waiting periods, we think, were a part of the transportation service which the appellant rendered to the Army. They were no different in nature than time spent awaiting a change in color of a traffic light.

The decree of the circuit court is affirmed.

Petition for rehearing denied February 18, 1947

## ON PETITION FOR REHEARING
(177 P. (2d) 422)

The petition for a rehearing asserts:

"1. That the Court erred in not confining its decision to the error of the lower court in its finding that waiting time was picking up and delivering, but, instead thereof, based its conclusion upon the theory that the waiting time was transportation, which point appellant has had no chance to argue before this Court;

"2. That the Court erred in not giving strict construction to a taxing statute but broadened the definition of the statute by including in 'transportation' all accessorial services in connection therewith."

The brief filed in support of the above contentions begins thus:

"Appellant brought this case to the Supreme Court in the belief that it was appealing from a judgment in a law action and not an equity decree. This belief was founded upon the fact that the proceedings below were filed and tried pursuant to statutory law (Uniform Declaratory Judgments Act—Sec. 6-601, O. C. L. A., et seq.). Under such

circumstances we assumed that the appeal would not be a trial de novo. * * * We believe that this Court (if this is properly a law action) is empowered only to review the decision below and has no original jurisdiction to try issues not appealed to it.''

Our Declaratory Judgments Act (§ 6-601 to and including § 6-616, O. C. L. A.) is the Uniform Declaratory Judgments Act which was written by the National Conference of Commissioners on Uniform State Laws. The act repeatedly uses in alternative form the words ''judgment'' and ''decree''. The former is appropriate to a proceeding in a court of law; the latter is normally used only in equity courts.

The final order of the circuit court from which the appellant appealed was entitled by the circuit court a decree. The complaint which instituted the proceeding commenced thus: ''Plaintiff, for cause of suit against the defendant * * *.'' Its brief, referring to the circuit court proceedings, stated: ''Consolidated thereupon brought suit for a declaratory judgment * * *. From a decree of the court below * * * this appeal was taken.'' The last words of the brief follow: ''Wherefore, plaintiff-appellant prays that the decision and decree of the lower court be reversed.''

Section 6-615, O. C. L. A., being section 15 of the Uniform Act, says:

''This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it, and to harmonize, so far as possible, with Federal laws and regulations on the subject of declaratory judgments and decrees.''

The section of the Uniform Act which invokes uniformity of judicial interpretation is frequently over-

looked. Nothing is gained through uniformity of legislation unless it is followed by uniformity of judicial interpretation.

From Borchard, Declaratory Judgments, (2d) 238, we now quote:

"As already observed, the power granted by the declaratory judgment statutes is more strictly a direction to use an existing power than an authorization of new power. As Bankes, L. J., remarked in Guaranty Trust Co. of New York v. Hannay & Co., 'I cannot doubt that had the Court of Chancery of those days (before 1852) thought it expedient to make mere declaratory judgments they would have claimed and exercised the right to do so.' Again, it is both historically and traditionally a power exercised primarily by courts of equity, and even where exercised by law courts it is largely equitable in nature. It is so treated by several courts, which have reserved the fullest liberty in moulding decrees to the necessities of the occasion, regardless of the prayer, although only occasionally do they impose conditions, as in the case of pure equitable decrees. In truth, the source of the power ought not to be considered as of any other than historical importance, for in principle declaratory relief is *sui generis* and is as much legal as equitable. It is, for example, not subject to the restrictions of equity that irreparable injury or inadequacy of the legal remedy be alleged or proved, although equitable defenses, such as laches and unclean hands, may induce a court in the exercise of its discretion not to issue a declaration. Since it is not purely an equitable action, it escapes some of the technicalities of equitable procedure. For example, were it purely equitable, the action of an alleged infringer against a patentee for a declaration of invalidity of the patent and non-infringement would have required the joining as a defendant of an exclusive licensee who, living

in another district, would have been impossible to serve and compel; but as a declaratory action, such joinder was deemed unnecessary. Where for some reason the petition for a declaration is regarded as a pure request for an equitable remedy in a case where other considerations persuade the court that a pending action at law gives full opportunity for equitable defenses and full relief, the declaration may be declined. More doubtful is the propriety of a dismissal rather than transfer on the calendar where the action at law, though considered more appropriate, has not yet been brought.

"In granting declarations construing contracts, wills or other written instruments, courts often consider themselves endowed with the inherent powers of a court of equity. Relief is sometimes granted and procedure made flexible in a way beyond the powers of a court of equity. It is roughly true to suggest, as did the Supreme Court of Ohio, that the declaratory judgment was adopted at least in part to fill the gap between law and equity. In addition, however, it was adopted to simplify procedure so far as possible and to give relief both in cases where coercive remedies were also available and beyond, where equity failed or had not perceived the need of or opportunity for judicial relief. But since history is often a reliable guide to interpretation and policy, the equitable characteristics of the relief warrant special attention. Doubts in matters of pleading and practice, including parties, should be resolved in favor of analogies from equitable proceedings."

From Anderson, Declaratory Judgments, § 56, the following is taken:

"When the history of a declaratory judgment action is looked to and taken into consideration, under whatever name it existed, whether it was one of the writs at ancient common law, or quia

timet in equity, this matter becomes rather easy of solution; and it is submitted that such actions may not be placed strictly in one category or the other.

"However, decisions are not wanting which broadly announce the rule that declaratory actions are equitable and governed by equitable principles, and occasionally a sporadic adjudication is to be encountered, which declares outright, they are simply and exclusively equitable actions and legal rights of actions may not trespass upon the domain occupied by them as such; and that when a legal defense is interposed in a declaratory judgment action, it is so purely equitable that the relief will not be granted; but these decisions proceed without taking into account the ancient character of declaratory actions and the fact that they existed at common law before the advent of the equitable system of jurisprudence.

\*       \*       \*       \*       \*

"There is another line of cases that, while not holding declaratory judgment actions to be strictly equitable, still hold them to be in the nature of equitable proceedings, or as partaking of some of the characteristics thereof. On the other hand, it is held that declaratory actions are properly classified as actions at law. To add to these various classifications, there are other adjudications holding that they are neither legal nor equitable, but are sui generis.

"It would seem that all of these positions are unsound, and that none of them can be sustained upon sound principles. It is not so much a matter of classification of the declaratory judgment action that is of importance as it is the right and duty of the courts to grant the declaratory relief in any action where it ought to be granted.

"The only sound position that can be taken with respect to such classification is that it partakes of the properties of both legal actions and suits in

equity, and that the court will apply the rules with respect thereto as the nature of the case seems to demand; that at times a declaratory judgment action may properly be classified as legal, carrying with it the attendant right to a jury trial; and that at other times, it may correctly be designated as a suit in equity, warranting the issuance of an injunction, and authorizing the granting of extraordinary relief generally.

"When the history and development of the granting of declaratory rights is considered, beginning at the earliest times when the common-law writs were used for that purpose, and then later, when these writs were supplanted by the action of quia timet in equity, on down to the enactment of the present day statutes, it is clear that the declaratory judgment action is both legal and equitable; and this position finds support in the modern adjudicated cases."

The New Jersey courts construe the Uniform Act as applicable only to equitable rights and deem proceedings under it as purely equitable in character. See Borchard, Declaratory Judgments, 2d ed., page 241, and Anderson, Declaratory Judgments, page 158. But other courts which have analyzed the nature of the proceedings authorized by the Uniform Act announced views similar to those set forth in the excerpts which preceding paragraphs of this opinion took from Borchard and Anderson; see *Holly Sugar Corp. v. Fritzler*, 42 Wyo. 446, 296 P. 206; *Morris v. Ellis*, 221 Wis. 307, 266 N. W. 921; *Lamb v. Wills*, 72 Ohio App. 496, 53 N. E. (2d) 530; *Strype v. Lewis*, 352 Mo. 1004, 180 S. W. (2d) 688, 155 A. L. R. 99; *Gray v. Defa*, 103 Utah 339, 135 P. (2d) 251, 155 A. L. R. 495; and *Manchester v. Townshend*, 110 Vt. 136, 2 Atl. (2d) 207; Id., 109 Vt. 65, 192 Atl. 22, 110 A. L. R. 811. *Pacific Indemnity Co.*

*v. McDonald,* 107 Fed. (2d) 446, 31 A. L. R. 208, (9th Circuit), says:

"The nature of an action for declaratory relief is correctly stated in the appellee's brief. It 'is neither legal nor equitable, but sui generis.' In Borchard on Declaratory Judgments, p. 120, it is stated: 'Declaratory relief is neither strictly equitable nor legal, although, as will presently be observed, its historical sources are almost exclusively equitable'."

The opinions just cited reflect a conception that declaratory judgment proceedings are *sui generis,* but subject in the main to the rules which govern causes in the equity courts. The fact that such proceedings have not been permitted to become shackled by outmoded and inappropriate procedure is due to the enlightened view which both the bench and the bar today take of procedural reforms intended to render the courts more useful.

■ Precedents such as the above, which construe statutes that are intended to create uniformity of law, are entitled to great weight. To refuse to follow them because of some minor difference of opinion would defeat one of the important purposes of such acts; that is, to gain uniformity of law.

■ We believe that the practice of this state has constantly deemed declaratory judgment proceedings as *sui generis,* but controlled largely by equity practice. See, for example, *Cabell v. City of Cottage Grove,* 170 Or. 256, 130 P. (2d) 1013, 144 A. L. R. 286; *Central Oregon Irrigation District v. Deschutes Co.,* 168 Or. 493, 124 P. (2d) 518; and *New Amsterdam Casualty Company v. Hyde,* 148 Or. 229, 34 P. (2d) 930, 35 P. (2d) 980. Section 13-715, O. C. L. A., says:

"When jurisdiction is, by the organic law of this

state, or by this code or any other statute, conferred on a court or judicial officer, all the means to carry it into effect are also given; and in the exercise of the jurisdiction, if the course of proceeding be not specifically pointed out by this code, any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of this code.''

The close affinity of declaratory judgment proceedings with equity suits, due possibly to the fact that the inspiration to write declaratory judgment statutes came from ancient powers possessed by the chancellor, is shown by the fact that, in this state at least, it has become common to accompany the petition for a declaration with a prayer for relief of a purely equitable character, such as an injunction. In fact, the supplementary equitable relief which is sometimes sought seems to engross the primary purpose of the proceeding. See generally the annotation, 155 A. L. R. 501.

■ Without setting forth further analysis, we express our conclusion that declaratory judgment proceedings, although *sui generis*, are governed largely by equity practice. Such being our belief, it follows that, upon appeal from a declaratory decree, this court is not bound by the findings of fact entered in the circuit court. In the present instance, no findings of fact were entered by the circuit court. The language which we quoted from the petition for a rehearing has reference, not to findings, but to a memorandum opinion which the trial judge filed.

The petition for a rehearing and its accompanying brief have received careful attention. We remain satisfied with the opinion we announced in this case.

The petition for a rehearing is denied.