[No. 2568–3.   Division Three.   January 4, 1979.]

U. S. F. & G. INSURANCE COMPANY, *Respondent,* v. MARY L. BRANNAN, ET AL, *Appellants.*

*Malott, Southwell & O'Rourke* and *Thomas Malott,* for appellant.

*Lukins, Annis, Bastine, McKay & Van Marter, Eugene I. Annis, Clark H. Richards, Layman, Mullin & Etter, John A. Sherrick,* and *Ronald K. Mullin,* for respondent.

ROE, J.—On November 11, 1975, John C. Brannan shot both his business associates in Triangle Construction Company. He killed Joseph E. Hedger and wounded Alfred E. Deviny. The shootings occurred around 2 p.m. at a jobsite near Liberty Lake, Washington. The wounded Deviny fled

the scene; Hedger was apparently killed instantly. Presumably, Brannan put Hedger's body in the back of his (Brannan's) pickup truck, drove around for a period of time, then left the body on a road in a relatively untraveled area. Brannan was discovered that same evening when his pickup overturned near a farmer's house. Hedger's body was unexpectedly discovered about a month later by a CB group on a field trip. Brannan maintained he had no recollection of the event. He remembers the early morning activities on that day: he went to Miller's Tavern and had some wine, looked at a Caterpillar machine, came back and drank some more, and believes he became intoxicated. Around noon, while he was at the tavern, he received a telephone call from one of the victims. They apparently wanted him to take some explosives to the jobsite. He doesn't recall driving to the jobsite, seeing Deviny and Hedger, or shooting them. Sometime around 5 o'clock in the afternoon he was pulled out of his overturned pickup by one Bushnell, on whose farm road it overturned. Bushnell testified that Brannan told him he was in deep trouble and threatened to kill himself. This met with no opposition from Bushnell, who indicated he had saved a couple others from suicide and it turned out that they had a lot more trouble afterwards. Brannan went with Mr. Bushnell to his home where he had some coffee and cookies, and talked coherently with Bushnell and a neighbor, Lund, until the sheriffs came. Brannan told the neighbor, Lund, that he had killed a man. According to Brannan, his memory returned at Bushnell's house that evening.

Plaintiff insurance company had issued a homeowner's policy, insuring John C. Brannan and Mary L. Brannan, which was in effect at that time. Anticipating a claim against it, plaintiff carrier brought this declaratory judgment action seeking an adjudication that there was no coverage or duty to defend under the policy. The case was submitted to a jury, which returned a verdict in the form of answers to four interrogatories exonerating the carrier. The

effect of it was that Deviny and Hedger's estates were foreclosed in any action against John C. or Mary L. Brannan from recovering from the insurer.

The policy did grant coverage to the activities of Mr. Brannan, unless his actions fell within specific policy exclusions. Page 3, paragraph E, in the section relating to coverages, states:

> This company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, to which this insurance applies, caused by an *occurrence*.

(Italics ours.) Page 4 HO3, paragraph 5, under "Additional Definitions," states:

> "Occurrence": means an *accident,* including injurious exposure to conditions, which results, during the policy term, in bodily injury or property damage.

(Italics ours.) Instruction No. 10, given to the jury stated that "accident," as used in an insurance policy,

> means an unexpected and unforeseen happening or occurrence which produces or brings about the resulting injury or death.

Defendant made no specific exception or objection to this instruction, but merely claims that it should not have been submitted to the jury, since there was no evidence to support a jury finding that it was not an accident. The first interrogatory to the jury was: "Was the wounding of Alfred E. Deviny and the death of Joseph Hedger an accident?" The jury answered: "No." The effect of that answer is a finding that since the event was not an accident, it was not an occurrence, hence was not covered, because only occurrences were within the terms of the policy. Stated another way: If the incident were not an accident, because in effect it was intended, then it was not an occurrence; thus, it is not covered by the terms of the policy. We shall consider the appropriateness of submitting that question to the jury in the discussion regarding exclusions.

The policy further provided, under "Exclusions," that it does not apply

d. to bodily injury or property damage arising out of business pursuits of any Insured except activities therein which are ordinarily incident to non–business pursuits.

. . .

f. to bodily injury or property damage which is either expected or intended from the standpoint of the Insured.

In answer to the other interrogatories, the jury stated:

2. That the injuries were intentional.
3. That they arose out of business pursuits.
4. That they were such activity not ordinarily incident to non–business pursuits.

Hence, the plaintiff prevailed on all grounds of exclusion from coverage. The appellant urges that no evidence supports the jury's finding on. the first three questions, and that the fourth should not have been submitted to the jury. If there is substantial evidence to support the jury verdict, it must stand.

This was a homeowner's policy and was not concerned with the business pursuits of the insured. Indemnity for such would have to come from a business policy, except that if it appeared that the injuries arose out of business pursuits, and if the activity was ordinarily incident to a nonbusiness pursuit even though it may have appeared to have arisen out of a business pursuit, there still would be coverage. In effect, the jury said by its verdict that the shootings arose out of a business pursuit, were intended, and that shooting a business associate was not ordinarily incident to a nonbusiness pursuit.

There was substantial evidence that the jury could find that Hedger and Deviny were on the job, that they called the insured Brannan to bring out some explosives on the day in question, that he came out and that there was a discussion in reference to the payment of rent on a piece of equipment which concerned Mr. Brannan. He appeared glazed and acted strange. Then suddenly he started shooting. According to the testimony of a psychiatrist, Dr. S.

Levy, Mr. Brannan had told him he remembered going out to Liberty Lake and had a big argument with Deviny and Hedger; he got sore and "blew his stack." Then there was no more memory. The jury found that the shooting was intentional and arose out of his business pursuit and there is sufficient evidence to support that finding. The jury may not have believed the testimony concerning retrograde amnesia, which is frequently associated with physical impact, other than intoxicants, or it may have considered the evidence that Brannan told Bushnell he was in deep trouble, threatened suicide, and told Lund that he had killed a man.

█ As stated in *Truck Ins. Exch. v. Aetna Cas. & Sur. Co.*, 13 Wn. App. 775, 777-78, 538 P.2d 529 (1975),

(1) Doubtful terms or phrases are interpreted against the insurer . . .

(2) Exclusionary clauses are to be construed most strongly against the insurer. . . .

(3) The language of. insurance policies is to be interpreted as it would be understood by the average man. . . .

(4) On the other hand, courts cannot create ambiguity or doubt where the language of the policy is not susceptible of more than one interpretation.

(Citations omitted.)

█ Defendants have cited some cases where there was a clear departure from business purposes, such as some personal animosity in striking a person, or a frolic unrelated to business.[1] We believe, however, that this case is controlled by the rationale of *McHenry v. Short*, 29 Wn.2d 263, 186 P.2d 900 (1947). In that case Short physically assaulted and killed McHenry. Short acted on behalf of the marital community interest when he ejected the deceased from the premises. Short was protecting property of which the community claimed ownership or over which it had some authority. There had been prior difficulties between the two

---

[1]*See* Annot., *Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy*, 48 A.L.R.3d 1096 (1973).

men. Mr. Short made the statement: ""I got mad and hit him."" *McHenry v. Short, supra* at 270. The court stated that, by a long line of decisions,

> it has become the settled law of this state that, if the tortious act of the husband be committed in the management of community property or for the benefit of the marital community, such community is thereby rendered liable for the act, under the doctrine of *respondeat superior.*

*McHenry v. Short, supra* at 273. Short's act was committed in the management of the community real estate or in the prosecution of the community's business as being a watchman on the premises. Even though there may have been bad blood between the two men, the altercation was construed as one continuous affair. Thus, the court found that Short had not "shed his character as agent of the community, and was then proceeding upon a misdeed for which he alone was chargeable." *McHenry v. Short, supra* at 274. In that case the tort–feasor was engaged in community business. Here, there was sufficient evidence to show a business quarrel, arising from John Brannan's business pursuits, in which he lost his head or "blew his stack." Certainly this series of events arose out of something, and all the evidence points to its having arisen out of a business call to defendant Brannan at the tavern, to which call he responded in the course of business.

In *Unigard Mut. Ins. Co. v. Spokane School Dist. 81,* 20 Wn. App. 261, 579 P.2d 1015 (1978), a young boy, insured through the policy of his parents, set fire to a school. The court noted:

> The policy extends defense and indemnification to "the Insured," and it excludes from coverage intentional acts resulting in injury or damage "expected or intended from the standpoint of *the insured.*"

(Italics ours.) *Unigard Mut. Ins. Co. v. Spokane School Dist. 81, supra* at 265. Since there were several insureds, there were separate contracts. The result was that an excluded act of one insured, an intentional act in *Unigard,*

did not bar coverage for additional insureds, who had not engaged in excluded conduct. The parents were liable for their son's intentional act, but since the parents did not intend the act, the policy was available to protect them or their creditor the school district.

The instant case concerns a different coverage exclusion than that involved in *Unigard*. Here, the policy does not apply to "damage arising out of business pursuits of *any Insured*" (italics ours); thus, it does not matter that the event did not arise out of Mary Brannan's business. The policy provides no coverage if the business pursuits of *any* of the separate insureds gave rise to the damage. Thus, *Unigard*'s holding, that this type of insurance policy is severable with respect to the various named insureds, becomes irrelevant to this issue.

The court also stated:

> We agree with Unigard that public policy prevents an insured from benefitting from his wrongful acts; . . .

*Unigard Mut. Ins. Co. v. Spokane School Dist. 81, supra* at 265. However, the relationship of the son to the parents as separate insureds is not the same as the relationship of one spouse to another, when one spouse has committed the act which fell within the policy's exclusion of coverage. The community would be liable for one spouse's intentional tort when committed while engaged in community business.

■ Here, the jury found that John Brannan's actions were not accidental, and were intentional. The jury was told by instruction No. 7:

> You are instructed that for an act to be regarded as "intended" as that word is used in the insurance policy, the actor must have the mental capacity to form the requisite intent to commit that act.

Instruction No. 9 provided:

> Proof that a person is intoxicated does not necessarily mean that the person cannot form the intent to act; for intoxication to prevent an act from being intended, the intoxication must have destroyed the person's mental capacity to form the requisite intent to do the act.

The defendants complain that their instruction No. D.B. 5 should have been given, namely that,

> If, by reason of intoxication, mental derangement, or mental aberration, John Brannan did not realize what he was doing at the time he shot Deviny and Hedger, you must find that he did not have intent as used in the insurance policy.

They argue that there was proof of mental aberration or mental derangement as a result of mental intoxication or otherwise. In a similar vein was defendants' proposed instruction No. D.B. 6:

> If you find that at the time of the shootings John Brannan did not have mental capacity to form the requisite intent to do the act, you must find that this was an accident or an occurrence as defined in the insurance policy.

We believe that instructions Nos. 7 and 9 adequately apprised the jury of the law respecting mental capacity to form the requisite intent to commit the act, and that intoxication must have destroyed a person's mental capacity in order to prevent the act from having been intended. With those instructions, the defendant could argue his theory of the case; that is what is required, *Short v. Hoge,* 58 Wn.2d 50, 360 P.2d 565 (1961); *Smith v. McDaniel,* 53 Wn.2d 604, 335 P.2d 582 (1959).

To permit the other spouse, in this case the wife, to get the benefit of the insurance would mean that the community would benefit from the wrongful act of one of its members. This would be contrary to public policy. *Unigard* does not support this result even though there are separate insureds. The community must accept the fact that there would be no insurance if one of its insureds should commit an act which is excluded and which binds the community. Otherwise, this would result in the anomalous situation of John Brannan's property indirectly having insurance coverage when, by his acts, he excluded himself from coverage. Whether he be an agent of the community or benefit as a principal, the result would be the same.

A similar situation arose in *Evans v. Pacific Indem. Co.,* 49 Cal. App. 3d 537, 122 Cal. Rptr. 680 (1975), where William H. Evans, operating a tavern he and his wife owned, inflicted serious bodily injury upon a customer. As in the instant case, the tort–feasor was also criminally prosecuted and convicted. The trial court dismissed the wife's argument on appeal that she had not personally wronged anyone, and that since she was a named insured, the exclusion of coverage for a willful act should not apply to her. The court dismissed this argument as having no merit.

We note that the altercation apparently arose over a business matter and took place on a business site during business hours. Finding that such activity constitutes a business pursuit is consistent with *Reliance Ins. Co. v. Fisher,* 164 Mont. 278, 521 P.2d 193 (1974); *Kermans v. Pendleton,* 62 Mich. App. 576, 233 N.W.2d 658 (1975); *Bruns v. Foremost Ins. Co.,* 27 Ill. App. 3d 50, 325 N.E.2d 815 (1975); and *Otero v. United States Fire Ins. Co.,* 314 So. 2d 208 (Fla. Ct. App. 1975). None of these cases supports defendant's contention that this court should hold, as a matter of law under these facts, that shooting one's business associates is activity "ordinarily incident to non–business pursuits," within the language of the exception to the business pursuits exclusion. We believe whether John Brannan's actions should be so classified is a question of fact within the province of the jury. We also believe these cases, and the instant case, are to be distinguished from those involving a skylark and horseplay, where the tort–feasor was on a frolic of his own. Substantial evidence supports the jury's verdict, so it must stand.

The holding of *Unigard Mut. Ins. Co. v. Spokane School Dist. 81, supra,* on the question of severability of the policy with respect to the various named insureds, deserves some attention in the following respects solely as to Mary Brannan. While the trial below and the order from which the appeal was taken was predicated on the liability of John

and Mary Brannan without reference to her separate liability, nevertheless, it would seem that the event would be an "occurrence" with respect to Mary Brannan as to her separate property, since it would fit, from her perspective, the definition of an "accident," given by instruction No. 10, as "an unexpected and unforeseen happening . . ." The interrogatories did not break that question down as to her. It would also appear that the event could not, from Mary Brannan's point of view, have been "expected or intended from the standpoint of the Insured." Nothing the jury decided was otherwise. This court was advised during oral argument that the actions by Deviny and Hedger's estates were filed against John Brannan and Mary Brannan individually as well as against the community. This was reaffirmed after argument by letter from Brannans' counsel.

■ The plaintiff insurance carrier has the burden of showing noncoverage. Whether the exclusion in the policy in reference to "damages arising out of business pursuits of any Insured" would apply to Mary Brannan individually was not briefed or presented to the trial court. Therefore, this court has not considered and does not decide whether the carrier has a duty to defend Mary Brannan separately.

The judgment is affirmed.

McINTURFF, J., concurs.

GREEN, J. (concurring)—I concur in the result because there is substantial evidence to support the jury's conclusion that the shooting was intentional, rather than accidental. Consequently, there is no insurance coverage. Having so concluded, it is unnecessary to reach the remaining issues.

Since the majority has discussed the other issues, I must respectfully express my disagreement with that portion of the majority's opinion which sustains the jury's conclusion that the shooting was an activity *not* ordinarily incident to nonbusiness pursuits. In my view, while the shooting may have arisen out of a business activity, it is expressly excepted from exclusion (d):

352

d. *to bodily injury or property damage arising out of business pursuits of any Insured except activities therein which are ordinarily incident to non–business pursuits.*

(Italics mine.) We should hold as a matter of law that an intentional shooting is "ordinarily incident to non–business pursuits" and, therefore, not within this particular exclusion. I am unable to conceive of a situation where an intentional shooting is incident to a legitimate business activity. To the extent that the majority concludes to the contrary, I must register my dissent.

Reconsideration denied March 5, 1979.