**Marion Ray MORRIS, Leopoldo Sanchez and Dorothy Sanchez, Appellants (Defendants),**

v.

**FARMERS INSURANCE EXCHANGE, Appellee (Plaintiff).**

**No. 87–187.**

Supreme Court of Wyoming.

March 22, 1989.

David A. Hampton of Honaker & Hampton, Rock Springs and Robert J. Reese of Reese & Mathey, Green River, for appellants.

John I. Henley of Vlastos, Brooks & Henley, P.C., Casper, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, and MACY, JJ. and BROWN, J., Retired.*

URBIGKIT, Justice.

Marion Morris called his neighbor, Leopoldo Sanchez, out into the street between their houses and, almost without words,

* Retired June 30, 1988.

shot him near dead with a .357 magnum pistol. This appeal is from a summary judgment in the insurance company declaratory judgment lawsuit, which followed an initial negligence and intentional tort injury action. The insurance company contested the homeowners' insurance liability and duty to defend coverages, and the decision was adverse to the injured party by application of the policy exclusion for intentional conduct.

We reverse.

Issues raised by appellants, Leopoldo and Dorothy Sanchez, in conflict with the insurance company, Farmers Insurance Exchange (Farmers Insurance) as appellee, assert that the district court erred in (1) denial of a duty to defend their insured Morris as the defendant in the liability action; and (2) granting summary judgment, holding that Farmers Insurance had no obligation to provide liability coverage under its insurance policy which would afford indemnity in the event that Sanchez should recover in the initial proceeding.

## FACTS

On August 8, 1985, Sanchez, following a home Bible study meeting, saw a friend to his street curb parked car, and then, as the car departed, received a call from across the street from Morris reported as, "Hey, Leo, I want to talk to you." Sanchez turned across the street and walked toward Morris, who was standing in his yard. On approach of the two parties, Morris raised a .357 magnum pistol and shot Sanchez in the face.[1]

Surviving the bullet wound, and then having apparently concluded that Morris had homeowner's insurance liability coverage, Sanchez and his wife, filed suit on May 1, 1986 against Morris, alleging negligence and assault and battery, with additional claims for infliction of emotional and mental distress to both husband and wife, and for punitive damages. The allegations also characterized Morris' action as one of willful, reckless, and wanton disregard. Responsive to that first litigative proceeding, after undertaking the defense under a reservation of rights, Farmers Insurance, pursuant to the homeowners' policy, commenced this declaratory judgment proceeding. This second lawsuit was instituted against Morris as well as both Leopoldo and Dorothy Sanchez to obtain authentication of the intentional conduct coverage exclusion provided in the policy. Farmers Insurance requested in the prayer that:

> [T]he Court declare as follows: (1) that coverage for the injuries alleged in the complaint and amended complaint of Leopoldo and Dorothy Sanchez does not exist under the insurance policy issued to Defendant Morris by Plaintiff Farmers Insurance Exchange; (2) that a duty to defend Defendant Morris does not exist with regard to the action initiated by the complaint and amended complaint of Leopoldo and Dorothy Sanchez; * * *.

Sanchez counterclaimed, with the prayer including a request that the insurance policy be declared to provide liability coverage and a duty to defend Morris in the pending liability action which they had filed.

In the summary judgment proceeding, segments of depositions of participants and affidavits of psychologists were tendered by both Farmers Insurance and Sanchez.[2]

---

1. The pleading characterization of the events is generally confirmed by eyewitness affidavit:

 1. That on or about August 8, 1985, I witnessed a shooting in Green River, Sweetwater County, Wyoming.

 2. That on that day, I was looking out my front door at 50 East Third Street, Green River, Wyoming, and observed the victim, a man by the name of Sanchez talking to someone in a car. As the car drove away, I heard the man who later fired the gun yell "Leo." At that time, Leo Sanchez turned and started walking toward the man who had called out, whose name was Morris.

 3. Morris had been in his front yard, but after he called out, he walked toward Sanchez and at a distance of approximately five feet, raised his hand in which he had a gun, Sanchez raised his hands in front of his face and yelled "No, no," and Morris fired one shot, Sanchez fell, and Morris turned and walked over next to his wife's car and lit up a cigarette.

2. A criminal action had been instituted against Sanchez with undefined results except as explained in oral argument. The factual scenario is perceived from both the summary judgment record and those oral argument comments sug-

At factual issue was the subject of the implicit intention of Morris to shoot or to scare, or whether he drunkenly and accidentally caused the injury to his neighbor. The degree of intoxication of Morris was clearly in controversy, with Sanchez contending that intoxication existed which made Morris incapable of forming the specific intent, and Farmers Insurance arguing for sobriety.

After review of the facts in detail in a fifteen page opinion letter, the trial court in dispositive order provided:

> [P]laintiff be granted summary judgment against the defendants, for the reasons that there are no genuine issues of any material fact and that plaintiff is entitled to judgment as a matter of law.
>
> JUDGMENT IS THEREFORE entered on behalf of plaintiff, Farmers Insurance Exchange, and against defendants; it is declared and is the judgment of the Court that plaintiff herein, Farmers Insurance Exchange has no obligation or duty to either defend or indemnify defendant Marion Ray Morris with regard to the claims alleged and action initiated by the complaint and/or amended complaint of Leopoldo Sanchez and Dorothy Sanchez, which arose from the shooting injury to Leopoldo Sanchez, which occurred on or about August 8, 1985.

The Sanchez counterclaim was denied with prejudice.

Only Leopoldo and Dorothy Sanchez appealed, Morris did not.

## DUTY TO DEFEND

 We are cognizant that a controversy concerning a duty to defend may be a proper subject of a declaratory judgment action even if a prior suit is pending. *Mathis v. Auto–Owners Insurance Company*, 387 So.2d 166, 168 (Ala.1980); *Fidelity & Casualty Co. of New York v. Envirodyne Engineers, Inc.*, 122 Ill.App.3d 301, 77 Ill.Dec. 848, 850–51, 461 N.E.2d 471, 473–74 (1983), insurer can seek a declaratory judgment to decide a factual issue relevant to the duty to defend, if the issue is not "crucial to the determination of the underlying lawsuit." Here, however, appellants argue that as a third-party beneficiary they can raise the issue on appeal to seek reversal of the summary judgment entered against Morris. Although the argument is academically constructed with some ingenuity, we find logic or precedent lacking that one litigant can appeal an opposing litigant's denied insurance carrier obligation for defense.[3]

> The general rule is that only a person who is aggrieved by a judgment can take an appeal from it. * * * Essentially the rule is one of standing. Just as the requirement of standing requires that one have a legally recognized interest before one is permitted to bring suit to protect that interest, so too must a person have an interest adversely affected by the judgment to be able to appeal the judgment.

R. Martineau, Modern Appellate Practice, Federal and State Civil Appeals § 5.2 at 72 (1983) (footnotes omitted). See *Parr v. United States*, 351 U.S. 513, 516, 76 S.Ct. 912, 915, 100 L.Ed. 1377, reh'g denied 352 U.S. 859, 77 S.Ct. 21, 1 L.Ed.2d 69 (1956).

gesting that Morris had criminally accused Sanchez of a sexual offense with Morris' grandchild. Lacking faith in the judicial process, Morris intentionally, or accidentally, or drunkenly, invoked self-help as personal retribution. Criminal charges against Sanchez were dismissed in preliminary hearing for lack of evidence, and charges of attempted homicide against Morris were concluded with a nolo contendere plea and a suspended sentence.

3. We recognize, in accord with general law, that the duty to defend may be more extensive than a requirement to indemnify, but does not substantively consider any application of the principal to this case where now settled in res judicata by district court decision and the litigant insured's failure to appeal. However, the issue seems to be singularly meaningless, since upon remand it is unlikely that Farmers Insurance would feel free to permit a default judgment to be awarded against their insured upon which carrier liability might thereafter be pursued on a litigatively finalized issue of fact and amount. Experience would portend a continued defense under reservation of right status. What will be determined in the tort case by special interrogatories or verdict, unless adverse to Sanchez, is problematical at this juncture of the course of litigation.

The United States Supreme Court enunciated in *Karcher v. May*, 484 U.S. 72, ——, 108 S.Ct. 388, 392, 98 L.Ed.2d 327, 334 (1987):

> [W]e have consistently applied the general rule that one who is not a party or has not been treated as a party to a judgment has no right to appeal therefrom. *United States ex rel. Louisiana v. Jack*, 244 U.S. 397, 402, 37 S.Ct. 605, 607, 61 L.Ed. 1222 (1917); *Ex parte Leaf Tobacco Board of Trade*, 222 U.S. 578, 581, 32 S.Ct. 833, 56 L.Ed. 323 (1911); *Ex parte Cockcroft*, 104 U.S. (14 Otto) 578, 579, 26 L.Ed. 856 (1882); *Ex parte Cutting*, 94 U.S. (4 Otto) 14, 20–21, 24 L.Ed. 49 (1877).

Dispositively, the United States Supreme Court held that the controversy over the New Jersey moment of silence statute "ended when the losing party—the New Jersey Legislature—declined to pursue its appeal." *Karcher*, 108 S.Ct. at 395.

Although Morris and Sanchez were named in the caption of the declaratory judgment action, they were not both treated as parties to the judgment with respect to the duty to defend. Clearly, appellants are not real parties in interest on the defense-duty controversy where they are not adversely affected by the judgment. It is irrelevant to them who fuels Farmers Insurance's litigative resistance. This issue is similar to one faced by the Court of Appeals of Georgia in *Wilmington Cabinet Co., Inc. v. Autry*, 169 Ga.App. 93, 311 S.E.2d 519 (1983). In that case, a property owner sued both the contractor and subcontractor for fire losses allegedly caused by improper installation of the kitchen vent hood. At the close of trial, the contractor was granted a directed verdict, and subsequently the jury returned a verdict in favor of the property owner. The subcontractor tried to argue that the directed verdict for the contractor was improper. That court held that since this was not a joint cause of action, the subcontractor had no standing to complain of the directed verdict against another defendant. *Wilmington Cabinet Co., Inc.*, 169 Ga.App. 93, 311 S.E.2d at 522. Like that case, Sanchez here has no capacity to appeal the summary judgment against Morris and in favor of Farmers Insurance *on the duty to defend the claim.*

## INDEMNITY

Appellants posture this present argument on two bases: procedure and substantive law. In procedural context, they contend that this action was premature in litigating the same issues included in the principal case before the first proceeding is terminated. Secondly, they claim that a factual issue was created relative to the application of the policy exclusion so that summary judgment was improvident or unjustified as a substantive legal decision.

### 1. *Prematurity*

■ We note at the outset that a declaratory judgment action can be beneficial as frequently used when the effect of insurance contracts are questioned. *Poling v. North American Life and Casualty Co.*, 593 P.2d 568 (Wyo.1979); *Mountain West Farm Bureau Mutual Insurance Co., Inc. v. Hallmark Insurance Co.*, 561 P.2d 706, 711 (Wyo.1977); Comment, *The Declaratory Judgment and the Insurance Contract*, 46 Yale L.J. 286 (1936). Consequently, we confine our decision to the facts of the case at hand where a declaratory judgment is instituted by an insurance company after the injured party's action was started and remains undetermined.

Within policy coverage litigation, it is possible to differentiate in the case law those questions where the claimant is clearly insured and the coverage for the act is in question from disputes whether any insurance exists for the claimant. *Navajo Freight Lines, Inc. v. Liberty Mutual Ins. Co.*, 12 Ariz.App. 424, 471 P.2d 309, 311 (1970). In this second category of litigation, some facts extrinsic to the dispute of liability in the underlying action establishes an absence of coverage. *Western Casualty & Surety Co. v. Teel*, 391 F.2d 764, 765–66 (10th Cir.1968); *Nationwide Mutual Insurance Co. v. State Farm Mutual Auto Insurance Co.*, 312 F.Supp. 216, 217 (W.D.Va.1970). One example is where the

insured breached the contract so insurer is relieved of its duties, *Insurance Company of North America v. Waldroup*, 462 F.Supp. 161, 162 (D.Ga.1978); *Barnes v. Waco Scaffolding and Equipment Co.*, 41 Colo.App. 423, 589 P.2d 505, 506 (1978); *American Policyholders' Ins. Co. v. Cumberland Cold Storage Co.*, 373 A.2d 247, 250 (Me.1977); *Employers' Fire Insurance Co. v. Beals*, 103 R.I. 623, 240 A.2d 397, 402 (1968), another is that the policy simply was not in effect at the time of the event. See *American Policyholders' Ins. Co.*, 373 A.2d at 250; *Connecticut Fire Ins. Co. v. Williams*, 9 A.D.2d 461, 194 N.Y.S.2d 952, 953 (1959). Similarly noted is *Aetna Life Insurance Co. of Hartford, Connecticut v. Haworth*, 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617, reh'g denied 300 U.S. 687, 57 S.Ct. 667, 81 L.Ed. 889 (1937), where the United States Supreme Court held that a declaratory judgment action was appropriate to determine if the policy had lapsed because of a failure to pay premiums.

This case is dissimilar from those status of insurance cases because here the policy defense and applied exclusion presents in factual issue precisely what happened and why, which then is the very substance of the damage recovery claim and litigation as an act coverage decision.

While there is a split of authority on what issues may be properly decided in a declaratory judgment action as long as the underlying suit is still pending, "[t]he majority of the most recent cases * * * have held that a declaratory judgment should not be entered if it depends on the resolution of factual disputes that are at issue in the underlying action." A. Windt, Insurance Claims and Disputes § 8.04 at 325 (1982). Further, see *Nationwide Mutual Insurance Co.*, 312 F.Supp at 217–18; *American Policyholders' Ins. Co.*, 373 A.2d at 250–51; *Town of Huntington v. Hartford Insurance Group*, 69 A.D.2d 906, 415 N.Y.S.2d 904, 905 (1979); and *Nationwide Mutual Insurance Co. v. Dennis*, 14 A.D.2d 188, 217 N.Y.S.2d 680, 681–82 (1961).

A case amazingly on point with the instant one is *Maryland Casualty Company v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976), modified on other grounds by *Shelter Mutual Insurance Co. v. Bailey*, 160 Ill.App.3d 146, 112 Ill.Dec. 76, 513 N.E.2d 490 (1987). The Supreme Court of Illinois held it was an abuse of discretion for the trial court to entertain the declaratory judgment which determined that the insured intentionally caused the injury when a personal-injury action had been filed more than four months before the declaratory judgment. *Maryland Casualty Company*, 355 N.E.2d at 30. That court found that the question of intent was one of the ultimate facts upon which recovery in the underlying suit was predicated and that the declaratory judgment was simply an inappropriate procedure. Also see *Brohawn v. Transamerica Insurance Company*, 276 Md. 396, 347 A.2d 842, 849 (1975), where the Court of Appeals of Maryland found an abuse of discretion in granting a declaratory judgment where the issue to be resolved was the ultimate issue in the pending suit since the insured would be exposed to potential punitive damages if the insurer proved the conduct was intentional. Thus, that court noted that the injured person is forced into a position of not only proceeding against the injuring party but also defending "against the vast resources and expertise of her insurer who would be trying to prove that which was its contractual duty to disprove." *Brohawn*, 347 A.2d at 849. In accord with this result, see *Auto Mutual Indemnity Co. v. Moore*, 235 Ala. 426, 179 So. 368 (1938); *Burns v. Hartford Accident & Indemnity Co.*, 157 So.2d 84 (Fla.App.1963); *Associated Indemnity Co. v. Insurance Co. of North America*, 68 Ill.App.3d 807, 25 Ill.Dec. 258, 386 N.E.2d 529 (1979); *State Automobile & Casualty Underwriters v. Gardiner*, 189 Kan. 544, 370 P.2d 91 (1962); *United States Fidelity & Guaranty Co. v. Kenosha Investment Co.*, 369 Mich. 481, 120 N.W.2d 190 (1963); *American Home Assurance Co. v. Port Authority of New York and New Jersey*, 66 A.D.2d 269, 412 N.Y.S.2d 605 (1979); *Preferred Mutual Insurance Co. v. Thompson*, 23 Ohio St.3d 78, 491 N.E.2d 688 (1986); *Employers Mutual Liability Insurance Co. of Wisconsin v. Bluhm*, 227

Or. 415, 362 P.2d 755 (1961); *Employers' Fire Insurance Co.*, 240 A.2d 397; and *Tennessee Farmers Mutual Insurance Co. v. Hammond*, 200 Tenn. 106, 290 S.W.2d 860 (1956).

As presented here, the trial judge in this subsequent declaratory judgment action is now placed in the position of first trying the underlying case as a question of whether Morris intentionally shot Sanchez—the very issue at dispute in the pending tort case. Additionally, with both suits instituted in state court,[4] there is no potential conflict between the federal and state court systems as might otherwise exist.

There are six justifications for taking a more restrictive view of utilizing declaratory judgments under facts similar to the instant ones:

1. The declaratory judgment action was not intended to be used to force the insured to have a "dress rehearsal" of an issue to be tried in the main case

2. The holding in the declaratory judgment action might inappropriately collaterally estop the parties to the main action as to certain factual issues

3. Such a proceeding would unduly burden the insured and improperly allow the insurer to wrest control of the litigation from the injured party

4. Such a declaratory judgment would violate the principle of judicial economy

5. Such an action would constitute an unwarranted interference with another court's proceedings

6. To the extent the declaratory judgment might resolve an issue adversely to the insured, it would be inherently unfair to force the insured to litigate against the insurance company; under those circumstances, rather than obtaining the benefit of the company's resources and expertise in defending against the plaintiff, those resources, for which the insured had bargained, would be turned against the insured and used to help establish his or her liability.

A. Windt, supra, at 326 (footnotes omitted). The institution of the declaratory judgment action as in the case at bar results in a race to res judicata or at least collateral estoppel, which is improper. 6A Moore's Federal Practice, ¶ 57.08[5] (1987); Annotation, *Extent to Which Principles of Res Judicata Are Applicable to Judgments in Actions For Declaratory Relief*, 10 A.L.R.2d 782 (1950). Furthermore, the Wyoming legislature has expressly recognized the potential problem with collateral estoppel and declaratory judgment by providing in part:

When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and *no declaration shall prejudice the rights of persons not parties to the proceeding.*

W.S. 1–37–113 (emphasis added). For a discussion of collateral estoppel generally, see *Texas West Oil and Gas Corporation v. First Interstate Bank of Casper*, 743 P.2d 857 (1987), reconfirmed 749 P.2d 278 (Wyo.1988). Clearly, Sanchez as a named defendant could be bound on the issue of whether Morris intentionally shot him or not, by the determination in the declaratory judgment action. Thus, the filing of the declaratory judgment amounts to procedural fencing by the insurance company, which is an improper, distorted use of the procedure as a foil, 6A Moore's Federal Practice,

---

**4.** See 1 W. Anderson, Declaratory Judgments § 209 at 448–49 (2nd ed. 1951) for the universal rule that both actions must be under the same sovereignties, states, or legal jurisdictions, and be between the same parties involving the same issues, for one action to bar the other. For a discussion of situations involving pending state suits and the institution of a declaratory judgment in federal court, see *Brillhart v. Excess Ins. Co. of America*, 316 U.S. 491, 495, 62 S.Ct. 1173, 1175–76, 86 L.Ed. 1620, reh'g denied 317 U.S. 704, 63 S.Ct. 23, 87 L.Ed. 562 (1942), which states:

Ordinarily it would be uneconomical as well as vexatious for a federal court to proceed in a declaratory judgment suit where another suit is pending in a state court presenting the same issues, not governed by federal law, between the same parties. Gratuitous interference with the orderly and comprehensive disposition of a state court litigation should be avoided.

See also Note, *Availability of a Declaratory Judgment When Another Suit is Pending*, 51 Yale L.J. 511 (1942) and Morrison, *Application of the Federal Declaratory Judgment Act For Life Insurance Cases*, 23 A.B.A.J. 788 (1937).

supra at 57–207; R. Keeton, Basic Text on Insurance Law at 508 (1971), or as an improper use of the declaratory judgment to allow the insurance company to forum shop. *National Union Fire Insurance Co. of Pittsburgh, Pa. v. Lippert Bros., Inc.,* 233 F.Supp. 650, 656 (D.Neb.1964).

Wyoming has long held that a declaratory judgment action should only be maintained where it would serve a useful purpose. *Beatty v. Chicago, B. & Q. R. Co.,* 49 Wyo. 22, 52 P.2d 404 (1935); *Holly Sugar Corporation v. Fritzler,* 42 Wyo. 446, 296 P. 206, 210 (1931); Note, *Basic Misconceptions of the Declaratory Judgment Law,* 12 Wyo. L.J. 66, 71 (1957). Benefit in duplicate litigation is not discernable when the liability of the insurer remains contingent and may never materialize for indemnity payment. *Allstate Ins. Co. v. Employers Liability Assurance Corp.,* 445 F.2d 1278, 1281 (5th Cir.1971); *Gibraltar Insurance Co. v. Varkalis,* 46 Ill.2d 481, 263 N.E.2d 823, 826 (1970); *National Savings Insurance Co. v. Gaskins,* 572 S.W.2d 573, 575 (Tex.App.1978). Consequently, we find that the trial court abused its discretion in allowing the declaratory judgment action to proceed to judg-

5. We do not consider nor address what effect on issue preclusion or collateral estoppel a decision or specific findings, if any, made in the first proceeding will have on this declaratory judgment action.

6. "Under Section II—Liability, *accident* means a sudden event, including continuous or repeated exposure to the same conditions, resulting in *bodily injury* or *property damage* neither expected nor intended by the *insured.*" [Emphasis in original.]

7. Q. Had you been drinking anything during the day—
A. No, sir.
Q. —prior to that time?
A. No, sir.
 * * * * * *
Q. Did you start drinking after you got home?
A. Probably.
 * * * * * *
Q. Well, you've heard your wife testify that you were drinking. Do you disagree with that?
A. No.
Q. You were drinking bourbon?
A. Bourbon.

ment first and that this second action should be held in abeyance until the issues of the principal case are first determined, as then to be pursued, if appropriate.[5]

### 2. *Summary Judgment*

Equally dispositive, is our further finding that summary judgment was improvidently granted.

The district court found, as a question of law that the insurance policy exclusion applied by factual determination, that the tortious act was intentional.[6] We have frequently re-emphasized the test for entry of summary judgment as whether a reasonable person could have found that an issue of fact existed as determinable within a reasonable doubt. *Cordova v. Gosar,* 719 P.2d 625 (Wyo.1986); *Weaver v. Blue Cross–Blue Shield of Wyoming,* 609 P.2d 984, 986–87 (Wyo.1980). A detailed reading of Morris' testimony reveals an actual conflict from what he said. If not confused at the time of the event, Morris was certainly contradictory and confused to a degree in his available testimony so that a clearly defined determination of his intent was not possible.[7]

Q. Do you recall what type of bourbon?
A. 80 proof is all I could say.
Q. When did you start drinking that day?
A. I, I don't recall the time. After I got home.
Q. And did you continue to drink pretty much up through and until the shooting incident with Mr. Sanchez?
A. I drank.
Q. Your wife felt that you were under the influence, that you were drunk. Would you disagree with that?
A. I'd have to disagree with it.
Q. Were you under the influence of alcohol to some degree?
A. To some degree, yes.
 * * * * * *
Q. Why do you think you were under the influence of alcohol that evening?
A. The way I understand it, if a person's drinking he's under the influence.
Q. Even after just one drink?
A. Even after just one drink.
Q. Had you had more than one drink?
A. Yes.
Q. How many drinks had you had?
A. I couldn't say. Several.
Q. Several?
A. I, I didn't care about counting them.

Q. Over what time period would you say, an hour, two hours, before the shooting incident?

A. Hour, possibly hour and a half.

Q. Would you say you had less or more than ten drinks?

A. Ten drinks? Well, what do you want to call a drink? How much is a drink?

Q. How were you drinking it?

A. Straight.

Q. Out of a shot glass?

A. Out of the bottle.

Q. Out of the bottle. Well, your wife testified she thought you'd consumed a half pint. Would you disagree with that?

A. It wouldn't be over.

Q. It could have been a half a pint?

A. It could have been a half. It wasn't over. I'm positive of that.

\* \* \* \* \* \*

Q. And you think you might have had a half pint and you might have consumed that anywhere between an hour and an hour and a half?

A. Yeah.

\* \* \* \* \* \*

Q. And you've heard her [his wife] testify today that—she testified that you told her you were going to kill Mr. Sanchez. Do you remember saying that to her?

A. No, I do not.

Q. Well, is it possible that you could have made that statement and you don't remember making it?

A. It's—I guess it's possible.

\* \* \* \* \* \*

Q. Angry to the point where you wanted to harm Mr. Sanchez?

A. At the time I had probably thought that there was no punishment too great. There would be no punishment to fit that crime.

\* \* \* \* \* \*

Q. In your mind, at the time he was shot, he was guilty?

A. Yes.

Q. And in your mind he had committed that heinous crime?

A. Yes.

Q. And you didn't believe that the judicial system would work, did you?

A. Right.

Q. You thought he'd get off?

A. Right.

\* \* \* \* \* \*

Q. What were you doing?

A. Well, it may not have been clear to me just what, just what I was doing.

Q. That maybe you were irrational?

A. Irrational? I don't—That's, that's a pretty big word. That covers a lot of territory.

Q. Well, you tell me then what was going on in your mind during that period of time. Certainly I don't know.

A. No, you wouldn't. You couldn't until it had happened. No one would understand what was going on in my mind, I guess. I guess probably I didn't understand what was going on in my mind. That's one of the most terrible things to happen to a kid.

\* \* \* \* \* \*

Q. Do you remember telling your wife she had to go inside the house because he had to be killed?

A. No.

Q. You don't recall making that statement?

A. I recall telling her to go in the house.

Q. Did you indicate to her that you were going to harm Mr. Sanchez?

A. I don't think—Consciously I didn't—I didn't want to tell her, show her—I feel that I didn't show her anything. I wanted her in the house.

Q. Why did you want her to go in the house?

A. I thought that was the place for her to be.

Q. Why?

A. I wasn't sure what was going to happen.

Q. What was going on in your mind when you sent her into the house?

A. Whatever did happen I didn't think it was necessary for her to see.

Q. Did you know that you were going to try to—Did you know in your mind that you were going to try to kill Mr. Sanchez?

A. (No response.)

Q. If you know.

A. I don't, I don't think I planned it.

Q. You don't think you necessarily meant to fatally wound him?

MR. REESE: Objection. He didn't fatally wound him.

Q. Or near fatal wound.

A. At the time I told her to go in the house I don't—I didn't know what might happen.

Q. Well, what was going on inside your mind, Ray? Were you confused?

A. Confused and concerned about the grandson and—

\* \* \* \* \* \*

A. I guess I shot him.

Q. You don't remember shooting him?

A. I can't—I can't—I can't remember the actual shot, no.

\* \* \* \* \* \*

Q. You don't recall lifting a gun and shooting Mr. Sanchez?

A. I can't—I can't recall lifting a gun.

Q. Do you recall whether you ever—Do you recall—strike that. Do you recall wanting to hurt Mr. Sanchez that evening by shooting him?

A. It—I don't—I don't believe it was in my mind to shoot him.

Q. Why do you say that?

A. Like you said, it's a terrible thing to do, to shoot a person. And a person in their right mind, I've always felt, wouldn't, wouldn't do that. I, I—It's a terrible step. I've always felt that way.

Q. In other words, you don't recall specifically getting a gun and wanting to shoot Mr. Sanchez?

With Morris' intent in dispute by his own statements, trial resolution is required to determine the application of the insurance policy exclusion.

Since we give all favorable inferences to the party opposing the motion, *Cordova*, 719 P.2d at 639; *Bancroft v. Jagusch*, 611 P.2d 819 (Wyo.1980), we find the psychological analysis of the intention factor as afforded by conflicting affidavits of separate psychologists also presented an issue of fact as at least creating a standoff between these forensic participants. Consequently, Farmers Insurance, the movant, did not prove the lack of a genuine issue of material fact concerning intent which would warrant summary judgment.

Separately implicated in the proceeding is the appropriateness of the finder of fact to grant summary judgment when the case hinges on factual event analysis for intent conclusions. The witnesses and experts whose affidavits were in dispute should be presented so the trial court may most accurately judge the veracity of the individuals. Credibility of the witnesses was at the heart of this case, making summary judgment inappropriate. *Greaser v. Williams*, 703 P.2d 327, 334 (Wyo.1985); 10A C. Wright, A. Miller and M. Kane, Federal Practice and Procedure: Civil 2d § 2726 (1983). Simply put, "[w]hen credibility is to be tested, the witnesses should testify at trial." *Cordova*, 719 P.2d at 639.

Another problem is created by the intoxication factor as it relates to the capacity to form an intent necessary to meet the insurance policy intentional-injury exclusion.[8] *Parkinson v. Farmers Ins. Co.*, 122 Ariz. 343, 594 P.2d 1039 (1979); *Transamerica Insurance Co. v. Thrift–Mart, Inc.*, 159 Ga.App. 874, 285 S.E.2d 566 (1981); *Badger Mutual Insurance Co. v. Murry*, 54 Ill. App.3d 459, 12 Ill.Dec. 672, 370 N.E.2d 295 (1977); *Burd v. Sussex Mutual Ins. Co.*, 56 N.J. 383, 267 A.2d 7 (1970); *Garden State*

A. I'm not sure what I—I'm not sure.

Q. You're not sure what was going on in your mind?

A. It's a terrible thing to go through. I—I—

\* \* \* \* \* \*

Q. Do you recall telling the police officer that you were the one who shot Mr. Sanchez?

A. Yes, I remember that.

Q. So you do have—At that time did you have, did you have a recollection that you had shot him?

A. It's clear in my mind that I put the gun back in the pickup and went over and leaned against her car.

\* \* \* \* \* \*

Q. You didn't put the gun in the truck so you could retrieve it and then solicit Mr. Sanchez across the street so you could shoot him?

A. No.

Q. That wasn't your plan?

A. (Shakes head)

Q. You never had a plan to shoot Mr. Sanchez, did you?

A. No.

Q. Is it your testimony that you really didn't intend to shoot Mr. Sanchez?

A. I can't—At the time of the shooting I can't, I can't—I don't know what my intentions were. It's unclear to me.

Q. You don't recall whether you wanted to frighten Mr. Sanchez with the use of a gun?

A. It might have entered my mind, but hindsight says, "Hey, that's a hell of a way to frighten; a loaded gun."

\* \* \* \* \* \*

Q. After your family went in the house, do you recall, is it your testimony you don't recall going to your truck to get a gun?

A. No, I can't—That's not clear in my mind.

Q. Has it ever been clear in your mind?

A. I don't believe it has.

Q. And you think that might have something to do with alcohol consumption that night?

A. I would have to say that there wasn't that much consumed that night, would be my judgment.

\* \* \* \* \* \*

Q. Your testimony is you didn't consume that much alcohol that night. I thought you just said that. You said not that much was consumed?

A. My judgment is that I hadn't had that much to drink, to be out of control.

Q. Well, do you think you were out of control?

A. I'm sure I must have been to do, to do what, what I did.

Q. Or what they say you did?

A. Or what they said I did. However you want to put it.

Q. Well, you don't actually consciously remember pulling the trigger and firing a shot at Mr. Sanchez?

A. No, I can't. I can't.

8. The enormity of the absurdity of the occurrence perforce demonstrates that Morris was irrational. At issue, however, was capacity, competency, and conscious intent.

*Fire & Casualty Co. v. Keefe*, 172 N.J.Super. 53, 410 A.2d 718, certification denied 84 N.J. 389, 420 A.2d 317 (1980); *United States Fidelity & Guaranty Ins. Co. v. Brannan*, 22 Wash.App. 341, 589 P.2d 817 (1979); *Kenna v. Griffin*, 4 Wash.App. 363, 481 P.2d 450 (1971). Thus, the issue of whether Morris was too drunk to form the requisite intent is a material issue. This inquiry was specifically addressed by the Georgia Supreme Court in a very similar circumstance in reversal of summary judgment received by the homeowner's insurance carrier after a shooting death where the court considered whether intoxication may render a person incapable of forming an intent or expectation of injuring another.

The question of intent or expectation here uniquely fits the pattern of those issues of material fact which are not appropriate issues for summary judgment but are decided by the trier of fact. *State Farm Fire & Cas. Co. v. Morgan*, 258 Ga. 276, 368 S.E.2d 509, 510 (1988). See Note, *The Intentional Injury Exclusion: When is There No Intent Behind the Intention?*, 11:3 Am. J. Trial Advoc. 527 (1988).

Issue preclusion and factual certainty necessary to justify summary judgment are not demonstrable in this record.

### RIGHT TO A DIFFERENT JUDGE UPON REMAND

■ A request for change of trial judge was addressed in appellate brief:

Appellants respectfully request reversal, remand and change of judge because of the fact that substantial and material issues of fact exist in this case, and that the trial judge, in his opinion letter, clearly stated that he would rule in the favor of Appellee if this matter were tried before the Court. The evidence in the record before the Court is substantially the same evidence that would be presented at any trial of this matter, and it would be a miscarriage of justice and waste of time for the litigants and the judiciary for this case to be remanded to the same trial judge who would then find

for Appellee in any event, resulting in yet another appeal.

Since the initial trial judge has retired, continued responsibility for the case is vested in the present active judge, pursuant to W.S. 5–1–106(f), even though the prior judge has been retained on a retired-active status. It is recognized that the first trial as a decision on the merits may resolve any inquiry for this case. For any further proceedings in declaratory judgment, non-reassignment will resolve the constitutional and due process concerns argued by the litigants. *State v. Haskins*, 220 Mont. 199, 714 P.2d 119 (1986).

Summary judgment is reversed as to Leopoldo and Dorothy Sanchez and the case is remanded for further proceedings in accord herewith.

CARDINE, C.J., filed a dissenting opinion, with whom BROWN, J., Retired, joined.

CARDINE, Chief Justice, dissenting, with whom BROWN, Justice, Retired, joins.

The object of a summary judgment motion is to separate pretended or merely formal disputes from those which are genuine and substantial. Thus, the bare assertion that an issue exists with regard to some material fact should be insufficient to defeat such a motion. *Johnson v. Soulis*, 542 P.2d 867, 871 (Wyo.1975). Neither should purely conclusory statements concerning ultimate facts suffice to raise a genuine issue for trial; the party resisting the motion must challenge the movant's allegations by setting forth specific facts which permit the fact finder to infer those ultimate facts. *Blackmore v. Davis Oil Co.*, 671 P.2d 334, 336–37 (Wyo.1983); *Bancroft v. Jagusch*, 611 P.2d 819, 821 (Wyo. 1980).

Alleging that it was relieved of its duties to defend and indemnify by a policy provision excluding coverage for Morris' intentional acts, the movant insurance company set forth facts to show that Morris intended to assault Sanchez. Those facts indicated that such intent commenced prior to

Morris' consumption of alcohol and continued unabated until the hammer fell on his magnum handgun. Sanchez offered, in response, the merely chimeric possibility that Morris could not form the intent to commit that battery because he was too drunk to have done so. While Sanchez offered evidence that Morris had been affected to some extent by his drinking, he offered nothing to show, in the face of much evidence to the contrary, that Morris was sufficiently intoxicated so as to destroy his ability to form the requisite intent. The whole purpose of a summary judgment is defeated if a party is permitted to transform his categorical assertion of ultimate facts into a genuine issue without some evidentiary support. *Maxted v. Pacific Car & Foundry Co.*, 527 P.2d 832, 834 (Wyo.1974).

In order to show that a genuine and substantial issue exists with regard to Morris' capacity to expect or intend the injuries he caused, Sanchez must raise more than a metaphysical doubt that such capacity was present. Though he is entitled to the benefit of every reasonable doubt, he is not entitled to prevail by raising merely a slight doubt. See *Cordova v. Gosar*, 719 P.2d 625, 636 (Wyo.1986). He must set forth facts from which reasonable minds could conclude that Morris was incapable of forming a tortious intent. Id. at 639; *Fegler v. Brodie*, 574 P.2d 751, 753 (Wyo. 1978). Because the record in this case will not support a reasonable conclusion that Morris' acts were unintentional, I dissent from the majority's conclusion that an issue of fact exists with regard to coverage under this insurance policy.

The record establishes that, for some two months prior to the evening of the shooting, Morris had been distraught over his grandchild's molestation by Sanchez. His anguish had been aggravated that evening by the imminence of Sanchez's hearing in that matter and his perception that Sanchez would go unpunished. At some time between 4:30 and 5:30 that evening Morris began drinking. Over the next hour and a half he consumed roughly one half-pint of bourbon. During that time, but before he and his wife sat down for dinner at 6:45,

Morris expressed doubts that Sanchez would be punished and suggested he would have to take that matter into his own hands. His wife became so alarmed she sought the assistance of their daughter to distract him from Sanchez.

Some time after finishing his evening meal, Morris went outside, followed by his wife and daughter. He told his wife that Sanchez would have to be killed, and ordered his family to return to the house. His wife called the police. In the meantime, Morris took a .357 magnum revolver from his pickup truck, called Sanchez from his home across the street and, when Sanchez approached to within a distance of approximately five feet, shot him in the face with the revolver. Morris then returned the gun to his truck, leaned against his wife's car, lit a cigarette, and waited for the police to arrive. During all of the evening's events, witnesses observed nothing but minor and isolated signs of Morris' intoxication. Indeed, Morris admitted that, though he felt the effects of the bourbon, he was not drunk. The record clearly indicates that throughout his conversations with his wife, his daughter, and the responding police officers, Morris appeared lucid, rational and unimpaired.

Such facts plainly show the intentional nature of Morris' conduct. Only by purely unbridled speculation could a reasonable mind conclude otherwise. Sanchez has merely shown that Morris was drinking. The issue of material fact which Sanchez purportedly raises is not whether Morris was affected by alcohol, but whether that effect was so great that Morris acted without the intent to do so. The undisputed facts presented on the summary judgment motion do not even present an issue. Morris exhibited neither extreme intoxication nor an inability to control his cognitive functions. Thus, Sanchez has suggested no reasonable grounds to conclude that Morris' conduct was unintentional, and he has not carried his burden with respect to appellee's motion. I would affirm.